[S. F. No. 18645.  In Bank.  Oct. 7, 1952.]

NORMAN J. HOLMBERG, Appellant v. ROBERT G. MARSDEN et al., Respondents.

Desmond N. Bonnington for Appellant.

James W. Harvey and Dorothy E. Handy for Respondents.

SCHAUER, J.—Plaintiff seeks to recover from defendants $5,000 furnished by plaintiff for a one-third interest in a business enterprise. He claims that payment of his money into the business before a permit had been secured for issuance of his one-third share of stock in a corporation which all parties agreed was to be formed, constituted a sale by defendants of securities in violation of the Corporate Securities Act (see Corp. Code, § 25000 et seq.) Judgment was rendered in defendants' favor by the court, sitting without a jury, and plaintiff appeals. We have concluded that the evidence supports the trial court's finding that no such sale occurred, and that the judgment must be affirmed.

The evidence appears to be without substantial dispute. In 1948 defendants Robert G. Marsden and Robert W. Marsden, father and son, were as partners operating a lumber business in Emeryville, under the name of West Coast Export Materials. In November of that year they were negotiating for purchase of a kiln in Oakland for the drying of lumber, but lacked sufficient capital to handle the undertaking. On November 16, 1948, Robert W. telephoned to his friend, plaintiff, who then lived in Seattle, and proposed that plaintiff join· in the venture with the two Marsdens by furnishing some $4,000 or $5,000 and also taking an active part in operating

the business, which would belong to the three men in equal shares, and that plaintiff "come on down and look the thing over." Plaintiff testified that during the telephone conversation "I said . . . 'I am not interested in any partnership, Bob, because I have known too many people become—lost their friendship through partnership . . . If I did venture into any business, it would have to be on a corporate basis.' He said, 'Well, certainly, that is the way we feel. We would want it incorporated also.' I said, 'That is the only way for protection for everybody concerned.' He said, 'What we do is incorporate it, and we will all put up equal shares of money, each have a third of the business and have equal shares of stock.'" At plaintiff's suggestion Marsden wrote plaintiff a letter the same day, setting forth in some detail the anticipated income and expenses of the proposed venture, the amount of capital needed and the purposes (chiefly for advance rent and for down payment on equipment) for which it was needed. Also included was a statement that a purchase contract or order had been received for three carloads of lumber, that further orders were expected from the same source, and that "you will have an equal share of stock as we do (⅓ interest now). We have or want and must file corporation papers as soon as possible as it is all made out in Dads and my name now. In other words, we have gone ahead, in fact have the first charge of lumber in the kiln now . . ."

A few days later plaintiff made a trip to Emeryville and personally investigated the project, and in conversations with the Marsdens it was agreed that if plaintiff "desired to come in" he need not resign from his Seattle job until the end of the year (1948) in order to protect "the bonus set-up that I had with my company" (this was at plaintiff's request), and "that the corporation papers would be sent up to me . . . [and] would be sent back signed with the money that we agreed would be placed up by each party, which at that time was $5,000. . . . [T]he interest in the corporation . . . would be one-third interest, and equal shares to each." Plaintiff returned to Seattle; articles of incorporation using the corporate name of Cal Kiln & Lumber Co., Inc., and naming plaintiff as one of the incorporators, were prepared and mailed to plaintiff; and plaintiff signed the articles as an incorporator and returned them to defendants with plaintiff's check for $3,000 payable to the order of Cal Kiln & Lumber, Inc. The check was endorsed "Cal Kiln & Lumber Inc., R. G. Marsden, for deposit only," and the proceeds were used by defendants

in part payment for the dry kiln being purchased. The articles of incorporation were submitted to the Secretary of State for filing, but were rejected because the proposed corporate name conflicted with that of an existing corporation. The name of M. & H. Kiln & Lumber, Inc. (the M. & H. stands for Marsden & Holmberg) was then agreed upon, new articles were prepared and filed in which an office employe of the business rather than plaintiff was named as the third incorporator inasmuch as plaintiff was still in Seattle, and a certificate of incorporation was issued. Plaintiff testified that he would not have contributed money to the venture "on any other basis" than "that a corporation would be formed."

On January 1, 1949, plaintiff came to Emeryville to locally participate in the business, his name was substituted for that of the office employe as a director and he was also made secretary-treasurer of the corporation, and took "charge of practically all of the outside work in the yard, the 'supervising of the . . . three or four men . . . working out in the yard." He was authorized to sign checks for the business, and on two occasions signed with one of the Marsdens on promissory notes for money borrowed from the bank on behalf of the business. All three men worked at the yard "every working day of the week," and each day conferred together concerning problems of the business. Robert W. Marsden acted as sales manager and the elder Marsden as bookkeeper and office manager. It was agreed that each should receive a weekly salary of $100. Two "official" directors' meetings were also held. On February 16 or 18, 1949, plaintiff deposited $1,500 to the bank account of M. & H. Kiln & Lumber, Inc.; he also refrained from drawing salary for five weeks, thus making up the balance of his total contribution of $5,000.

When the first directors' meeting was held, in January, 1949, an accountant who was present advised the three men that it would be futile to apply for a permit to issue stock until the business had operated long enough to display an "acceptable" financial statement, and it was agreed "that we would just wait." No application for such a permit was ever made. Neither was application ever made "for a permit to take consideration in connection with pre-incorporation subscriptions." (See Corp. Code, § 25153.)

The conditional sales contract under which the dry kiln was being purchased was formally executed December 22, 1948, and named the two Marsdens as purchasers. The contract was never transferred to the corporation because the

seller "would not permit it." Robert W. Marsden testified, however, that they were buying the equipment "for the interest of all three people that were going to be in this corporation . . . [and] always treated that as a part of the assets of this business," and that the Marsdens themselves put between $11,000 and $12,000 cash into the business "plus prospects and a going business which we had prior to this under West Coast Export Materials."

By May, 1949, the business was in bad financial straits and plaintiff demanded return from defendants of the $5,000 he had contributed, and thereafter instituted this action to recover it. At the time of trial (May, 1950) the Marsdens were still operating the business, had completed paying for the dry kiln, and. were "trying to pull this thing out . . . [although] it is very much in the red."

The trial court found and concluded, contrary to allegations of plaintiff's complaint, that the Marsdens did not offer to sell plaintiff a one-third stock interest in a corporation, that no "payments of money were made to defendants on the representation by said defendants that plaintiff would be issued one-third of the stock" in the corporation which was formed, that defendants did not defraud plaintiff, that plaintiff has not been damaged "by reason of any representations or any acts or conduct of" defendants, and that defendants were not indebted to plaintiff. Judgment was entered in defendants' favor, and plaintiff appeals, contending that the evidence does not support the findings.

■ The power of an appellate court, in deciding such a contention, begins and ends with a determination as to whether there is any substantial evidence which will support the findings, and all reasonable inferences must be indulged to uphold them. (*Estate of Bristol* (1943), 23 Cal.2d 221, 223 [143 P.2d 689]; *Richter* v. *Walker* (1951), 36 Cal.2d 634, 640 [226 P.2d 593].) ■ It is apparent that the evidence amply supports the essential findings. Plaintiff's own testimony establishes that a corporate form of organization was not only first suggested by him, but that he insisted upon it and agreed to, and did participate in, the enterprise on that basis. This supports the factual conclusion that defendants did not sell or offer to sell to plaintiff a one-third stock interest in a corporation but, rather, participated with plaintiff in organizing the enterprise; the fact that defendants made the original proposal that the three parties join in the business venture does not compel a contrary finding. Consistently with the

court's findings it appears that plaintiff was at all times kept fully informed of all matters in connection with the business and he was named in and he signed as an incorporator the first proposed articles of incorporation; omission of his name as an incorporator in the articles which were finally accepted for filing was only because, at his own request and to serve his own ends, he had remained at his Seattle job until the end of the year in order not to lose his bonus rights. After coming to Emeryville he participated fully and actively in conducting the business, as he had agreed to do from the start, and acquiesced and agreed ''that we would just wait'' until a sounder financial status had been reached before applying for a permit to issue stock to the three owners.

Whether the three men, as among themselves, be termed partners, joint venturers, or copromotors of a corporation (see *Morris* v. *Whittier Amusement Co.* (1932), 123 Cal.App. 121, 123 [10 P.2d 1017]; 6A Cal.Jur. 278; 13 Am.Jur. 265), it is obvious that the trial court was justified in concluding that they stood on an equal footing as entrepreneurs. It is significant that it was only after the financial outlook began to worsen that plaintiff sought to recover his contribution. There appears no more reason for defendants to reimburse plaintiff for his contribution to the venture than for plaintiff to reimburse defendants for theirs. At the time of trial defendants were still devoting their time and energies to operating the business for the benefit of all three owners, which included plaintiff.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.