[S. F. No. 18194. In Bank. May 26, 1953.]

Estate of CHARLES J. ARBULICH, Deceased. JOHN ARBULICH, JR., Appellant, v. THOMAS S. ARBULICH, Respondent.

Haas & Schwabe, Hubbard & Hubbard, Peter A. Schwabe and Emmet B. Hayes for Appellant.

Frank J. O'Brien for Respondent.

SCHAUER, J.—Following hearings on petitions to determine heirship in this estate the probate court found that on March 21, 1947, the date of death of the decedent (see *Estate of Giordano* (1948), 85 Cal.App.2d 588, 594 [193 P.2d 771]), the reciprocal inheritance rights prescribed by section 259 of the Probate Code did not exist between residents and citizens of this nation and those of Yugoslavia as to either real or personal property. Judgment was thereupon entered to the effect that decedent's surviving brother Thomas (respondent herein), residing in and a citizen of the United States, is entitled to distribution of decedent's entire estate, to the exclusion of a surviving brother, John, who resides in and is a national of Yugoslavia. The two brothers are decedent's sole heirs at law. John appeals, contending that the evidence is not sufficient to support the finding of nonreciprocity. The question before us is not whether we, if we were viewing the evidence initially, should find that the greater weight seemed to favor appellant or the respondent but is, rather, whether we can hold that as a matter of law the finding of the probate court is without substantial evidentiary support. Every reasonable inference must be drawn in favor of the respondent. (*Holmberg* v. *Marsden* (1952), 39 Cal.2d 592, 596 [248 P.2d 417].) So viewing the evidence we have concluded that appellant's contention cannot be sustained and that the judgment should be affirmed.

Charles J. Arbulich, the decedent, was a naturalized citizen of the United States who died in San Francisco. By his will he left his entire estate, consisting of both real and personal property, to his father if the father survived the testator, otherwise to the testator's brother, appellant John Arbulich, Jr., of Yugoslavia. The father predeceased Charles. Both respondent Thomas and appellant John (by the Consul General of Yugoslavia, who purports to be John's attorney-in-fact) filed petitions to determine heirship, and this proceeding followed.

The question on the merits, as already indicated, is whether the evidence supports the court's finding that the reciprocal rights required by the provisions of section 259 of the Probate Code did not exist on March 21, 1947.[1] ■ Treaties, statutes, and other evidence of the foreign domestic law may be considered. (*Estate of Knutzen* (1948), 31 Cal.2d 573, 579 [191 P.2d 747]; *Estate of Bevilacqua* (1948), 31 Cal.2d 580, 582 [191 P.2d 752].) ■ Where treaties or statute law alone are before the court the construction thereof is a matter

---

[1]Section 259 read as follows on that date: ''The right of aliens not residing within the United States or its territories to take real property in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take real property upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are residents and the right of aliens not residing in the United States or its territories to take personal property in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take personal property upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are residents. It shall be presumed that such reciprocal rights exist and this presumption shall be conclusive unless prior to the hearing on any petition for distribution of all or a portion of such property to an alien heir, devisee or legatee not residing within the United States or its territories a petition is filed by any person interested in the estate requesting the court to find that either one or both of such reciprocal rights does not or do not exist as to the country of which such alien heir, devisee or legatee is resident. Upon the hearing of such petition the burden of establishing the nonexistence of such reciprocal right or rights shall be upon the petitioner. Notice of such hearing shall be given in the manner provided by Section 1200 of this code.''

Effective in September, 1947, section 259 was amended by striking therefrom the last three sentences as quoted hereinabove. At the same time section 259.1 (added to the Probate Code in 1941 and repealed in 1945) was added, as follows: ''The burden shall be upon such nonresident aliens to establish the fact of existence of the reciprocal rights set forth in Section 259.''

of law, but the question of how the foreign country has construed and applied such treaties or statutes is a question of fact. ■ A finding by the trial court on the issue of reciprocity is to be treated like a finding on any other issue of fact and if there is evidence to support it such finding will not be disturbed on appeal. (See *Estate of Schluttig* (1950), 36 Cal.2d 416, 423-424 [224 P.2d 695]; *Estate of Reihs* (1951), 102 Cal.App.2d 260, 268 [227 P.2d 564]; *Estate of Miller* (1951), 104 Cal.App.2d 1, 4 [230 P.2d 667].)

The following documentary evidence was included in that before the court in this proceeding:

1. A copy of the Constitution of Yugoslavia, which apparently became effective on January 31, 1946. It is declared therein, among other things, that (Article 18), "Private property and private initiative in economy are guaranteed. The inheritance of private property is guaranteed. The right of inheritance is regulated by law. No person is permitted to use the right of private property to the detriment of the people's community . . . Private property may be limited or expropriated if the common interest requires it, but only in accordance with the law. It will be determined by law in which cases and to what extent the owner shall be compensated. Under the same conditions individual branches of national economy or single enterprises may be nationalized by law if the common interest requires it. [Article 19.] The land belongs to those who cultivate it. The law determines whether and how much land may be owned by an institution or a person who is not a cultivator. There can be no large land-holdings in private hands on any basis whatsoever. The maximum size of private land-holdings will be determined by law."

2. A Yugoslav decree dated July 16, 1946, pertaining to the acquisition of real property by foreigners. It provides, in part, that "Foreign citizens may acquire rights to ownership of real estate in . . . Yugoslavia either by legal business among the living or by legacy (in case of death) only by previous approval of the competent government agency. . . . [Such] limitations . . . shall not refer to acquisitions of real estate by legal inheritance . . . Permits . . . shall be issued by the Chairman of.the Economic Council of [Yugoslavia] . . . " with an appeal "to the Government" allowed if a permit is refused. The Chairman of the Economic Council is "authorized to issue instructions and explanations in connection with the application of this decree." The decree

provides no guide or standard to control the chairman or "the Government" in determining when and whether permits shall issue.

3. A Yugoslav decree dated March 20, 1948, entitled "Control of Real Estate Transactions," which provides in article 5 thereof that "Foreign citizens may not acquire right of property on real estate [in] . . . Yugoslavia, except on the basis of legal inheritance," and in article 8 that "The provisions hereof are not valid for acquiring real estate by Yugoslav citizens on the basis of legal inheritance or on the basis of inheritance through testaments." Article 10 invalidated the decree of July 16, 1946 (item No. 2, hereinabove).

4. A copy of a letter[2] dated January 19, 1949, from A. G. Heltberg, American Consul in Belgrade, Yugoslavia, addressed to the Controller of the State of California, in which it is stated, among other things, that the provision of the Yugoslav decree of March 20, 1948, that "Foreign citizens may not acquire right of property or real estate [in] . . . Yugoslavia except on the basis of legal inheritance," has been "informally interpreted" by the claims office of the Yugoslav Ministry of Foreign Affairs "to mean that foreign citizens may inherit property if they, under Yugoslav law, are considered to be the natural heirs of the deceased. If property is willed to some other person than the natural heir that person may not succeed to the property in question."

It is apparent that the evidence summarized hereinabove is sufficient to support a finding that on the date of decedent's death in 1947 reciprocal rights did not exist with respect to real property. In the decree of July 16, 1946 (which remained in effect until invalidated by the decree of March 20, 1948), it is declared that foreign citizens may acquire real property "by legacy (in case of death) only by previous approval of the competent government agency," and that such limitations shall not refer to acquisitions by "legal inheritance." As already noted herein, no standards are provided to guide either the government agency or a testator in determining in what situations, if any, such acquisition by legacy would be approved, and it is inferable that the granting, the withholding, or the conditions of granting, approval may vary from case to case according to the discretion of the governmental agency as exercised in an unbounded field

[2]Admitted into evidence without objection from appellant.

and unguided by standards of equality of application. The situation thus appears to be comparable to that before the court in *Estate of Schluttig* (1950), *supra,* 36 Cal.2d 416, 425, in which it was held that when "the taking of estates by testamentary disposition or succession is a matter of sufferance determinable in accordance with directions of the Nazi officials and their concepts of national sentiment, there is no 'reciprocal right' as that term is used in the Probate Code."

Furthermore, it is to be noted that section 259 of the Probate Code, which is here involved, limits the right of the nonresident alien "to take real property in this State by succession or testamentary disposition," to those instances where there is "a reciprocal right upon the part of citizens of the United States to take real property upon the *same terms* and *conditions* as residents and citizens" (italics added) of the country of the alien's residence. That the terms and conditions on which foreigners may acquire real property in Yugoslavia by testament differ from those on which it may be so acquired by Yugoslav citizens is a reasonable inference to be drawn from the decree of July 16, 1946. Although the provisions of the decree of March 20, 1948, and of the interpretation thereof by Yugoslav authorities which is set forth in the consular letter of January 19, 1949, do not directly establish Yugoslav law as of the date of the testator's death herein (March, 1947), they do tend to confirm that under the decree of July 16, 1946, a differentiation was established between the right of foreigners who are natural heirs of the deceased to succeed to real estate "by legal inheritance" and any rights claimed by other foreigners to take real estate "by legacy (in case of death)."

 Appellant contends, nevertheless, that the provisions of article II[3] of a treaty entered into in 1881 between the United States and the Kingdom of Serbia (of which the present Republic of Yugoslavia is the successor government) and certified by the Secretary of State of the United States as re-

---

[3]Article II of the treaty reads as follows: "In all that concerns the right of acquiring, possessing, or disposing of every kind of property, real or personal, citizens of the United States in Serbia and Serbian subjects in the United States, shall enjoy the rights which the respective laws grant or shall grant in each of these states to the subjects of the most favoured nation.

"Within these limits, and under the same conditions as the subjects of the most favoured nation, they shall be at liberty to acquire and dispose of such property, whether by purchase, sale, donation, exchange,

maining in full force and effect between this country and Yugoslavia, are applicable and controlling in appellant's favor on the issue of reciprocity. It may be noted that the first paragraph of article II seemingly treats only of "citizens of the United States in Serbia [Yugoslavia] and Serbian [Yugoslav] subjects in the United States," rather than, as is the situation in the present case, of a United States citizen who dies in the United States and leaves property to a Yugoslav subject who is *in Yugoslavia,* and therefore is not here applicable. Even if we assume its applicability in that respect, however, the rights granted are only those given by each of the contracting nations "to the subjects of the most favoured nation,"and do not purport to equal the rights given or guaranteed by each of the contracting nations to *its own* citizens. Consequently the treaty provisions do not establish the reciprocal rights required by the Probate Code.

 Testimony by the Ambassador of Yugoslavia to the United States that "Yugoslavia accords to citizens and residents of the United States their full and equitable rights of inheritance under . . . the Convention [treaty] of 1881, . . . [and that] whether the Convention itself is applicable or not . . . Americans do have their full, complete and unabridged rights of inheritance to inherit from their relatives or from their estate in Yugoslavia," serves at most to create a conflict in evidence as to the ultimate fact and is not controlling on the issue of reciprocity. Upon the record we are bound to hold that the evidence is not as a matter of law insufficient to support the finding of the trial court that at the time of decedent's death reciprocal rights within the meaning of the applicable statute did not exist as to real property.

 As to whether reciprocity existed with respect to personal property, there is a substantial conflict of opinion evidence and both appellant and respondent urge that evidence of that nature, offered by the other, was improperly received. We need not pass upon such contentions, however, because it does not appear that the errors, if any, in regard to the admission of opinion evidence were prejudicial. In the light

marriage contract, testament, inheritance, or in any other manner whatever, without being subject to any taxes, imposts, or charges whatever other or higher than those which are or shall be levied on natives or on the subjects of the most favoured state.

"They shall likewise be at liberty to export freely the proceeds of the sale of their property, and their goods in general, without being subjected to pay any other or higher duties than those payable under similar circumstances by natives, or by the subjects of the most favoured state."

of the other evidence upon the subject, hereinafter mentioned, we do not think it likely that a different result would have been reached in the trial court if the disputed opinion evidence had not been received. (Cal. Const., art. VI, § 4½.)

Aside from the expressions of opinion, a copy of the Yugoslav Constitution, as hereinabove mentioned, and copies of Yugoslav decrees governing transactions with foreign countries and their nationals were received in evidence without objection, and such Constitution and decrees in themselves support the finding of the trial court that reciprocity did not exist with respect to personal property. Provisions of the Constitution have already been mentioned. The first of the decrees, which became effective September 7, 1945, provides: "630. By virtue of Article 2 of the Resolution of November 30, 1943 on the Supreme Legislative and Executive People's Representative Body of Yugoslavia as a provisional organ of the supreme people's authority in Yugoslavia and in connection with the Resolution of August 10, 1945 covering the change of name of the Antifascist Council of National Liberation of Yugoslavia into Provisional People's Assembly of the Democratic Federative Yugoslavia, and at the suggestion of the Minister of Finance, the Presidium of the Provisional People's Assembly of the Democratic Federative Yugoslavia decree.

"THE LAW
"REGULATING PAYMENT TRANSACTIONS WITH FOREIGN COUNTRIES
"(FOREIGN EXCHANGE LAW)
"BASIC RULES

"*Article 1*

"All financial transactions with foreign countries, as well as all transactions within the country in relation to foreign countries that may affect the development of the credit balance of our country and the international value of our domestic currency (foreign exchange transactions) are subject to the control of the Federal Minister of Finance (foreign exchange control).

"*Article 2*

"Primarily the following transactions are subject to control.

"(a) All transactions within the country and with foreign countries: in foreign exchange, claims and debts in foreign currency and other values in foreign currency;

"(b) All transactions with foreign countries: in domestic currency, credits and debits in domestic currency and other values in domestic currency;

"(c) All transactions with foreigners within the country, causing changes in property relations between our country and foreign countries; and . . .

### "*Article 3*

"The term *transaction* from Articles 1 and 2 as used in this law means the transfer of values and metals and payments, it also means the establishment, cancellation and change of obligations and actual rights to values and metals, as well as changes of holders of rights and obligations.

### "*Article 4*

"Permission must be had for transactions described in Articles 1 and 2 of this Law according to foreign exchange regulations.

### "*Article 5*

"It is forbidden to conclude business in the country the amount of which in domestic currency is tied to gold or some foreign currency. . . .

### "*Article 6*

"(1) The Federal Minister of Finance as the supreme foreign exchange authority, exercises his control over foreign exchange through: [various agencies] . . .

"(2) The Federal Minister of Finance regulates the limits of jurisdiction as between the foreign exchange authorities in regard to the exercising of foreign exchange control, be it by Regulations from Article 25 of this Law, or by separate decisions.

### "*Article 7*

"(1) Transactions, subject to foreign exchange control according to this Law, may be conducted only by persons and establishments authorized to do so by the competent foreign exchange authorities, unless the conduct of such business is permitted by the foreign exchange rules themselves. . . .

### "*Article 8*

"The National Bank, whenever authorized by the Federal Minister of Finance, may at any time request the holders in the country to offer for sale to the National Bank all their foreign exchange (regardless whether it be in the shape of claims in foreign currency, checks, drafts, etc.), foreign cur-

rency, foreign values and precious metals. If the National Bank decides to buy, it shall fix the terms. . . .

### "Article 12

"(1) The term 'devisa' as used in the foreign exchange regulations means a claim abroad on whatever basis, in whatever currency, regardless of the manner of disposal. . . .

### "Article 13

"(1) The term *foreigners* as used in this Law means all persons and corporations with permanent residence or seat abroad, regardless of citizenship of persons and ownership of enterprises.

"(2) The term *domestic persons* means all persons and corporations with permanent residence or seat within the country, regardless of citizenship of persons and ownership of enterprises. . . .

### "Article 16

"(1) The penalties for foreign exchange infractions are: . . .
 "2. Confiscation of objects or values constituting the foreign exchange infraction, in full or in part. . . .

"(2) The Federal Minister of Finance shall pronounce penalties. . . .

### "Article 25

"The Federal Minister of Finance shall issue more detailed rules, regulations and decisions for the execution of this Law, upon consulting the National Bank. . . ."

The second decree, effective October 25, 1946, confirms the decree of September 7, 1945, and amends it in various respects which appear to be largely immaterial here. However, article 24 of the second decree provides that "The Minister of Finance of FPRY is herewith authorized to issue regulations, instructions, orders and decrees for the execution of this law," thus confirming the apparently unlimited power of the Minister of Finance over foreign exchange transactions.

Appellant urges that the "Foreign Exchange Law" has no materiality in relation to the question of reciprocity; that it is merely "regulatory of foreign exchange and has no reference whatever to rights of inheritance." But a reading of the entire substance of the documents mentioned makes it apparent that the trial court was justified in reaching the conclusion that under Yugoslav law a citizen of the United States, at the time of decedent's death, had no definitely ascertainable and enforceable right to *receive* Yugoslav property by

testament, and that the receipt of any such property would depend in each case upon the largely, if not entirely, uncontrolled discretion of the Minister of Finance. This is far different from a standardized regulation which might merely delay the transmission of gold, money, or other stores of value from one nation to another. (See *Estate of Schluttig* (1950), *supra,* 36 Cal.2d 416, 425; *cf. Estate of Miller* (1951), *supra,* 104 Cal.App.2d 1, 12, 13.) ▆ Here it is pertinent to observe, as was declared in *Estate of Blak* (1944), 65 Cal.App. 2d 232, 238 [150 P.2d 567] : ''The 'right' to take property by inheritance and the 'right to receive' that inheritance by payment in money, have long been recognized as part of the substantive, legal and sanctioned incidents of the normal legal order of society. . . . The 'right' to receive the benefits of the inheritance is a necessary and inherent corollary to the 'right' to take by inheritance. One is not separable from the other. The one includes the other. If the right to take exists . . . the right to receive exists . . .''

▆ Upon the record before us, which includes the Constitution and the Resolutions and Decrees of Yugoslavia as above mentioned, we cannot hold that as a matter of law the trial court was not justified in concluding that whether a citizen of the United States, as of the date of decedent's death, might in any particular case actually receive possession and marketable title to real estate in Yugoslavia devised to him or personal property, or its value, bequeathed to him, was a matter of grace or individual indulgence rather than of right based on uniform law.

By reason of our conclusion that no prejudicial error is shown and that the evidence supports the finding of the trial court that on the date of decedent's death reciprocity as contemplated and defined by our law did not exist in Yugoslavia with respect to either real or personal property, it becomes unnecessary to consider or decide respondent's further contentions.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The majority opinion is out of harmony with my concept of the principles of law applicable to this case and I am in full accord with the views expressed in the able and learned

opinion prepared by Mr. Justice Peters when this case was before the District Court of Appeal and adopt said opinion as my dissent:

"Charles J. Arbulich, the decedent, was born in the country now known as Yugoslavia, came to the United States, became an American citizen, died in San Francisco on March 21, 1947, and left an estate consisting of real and personal property. By his will he disinherited his American citizen brother, the respondent Thomas S. Arbulich, and left his entire estate to his father, if he should survive the testator, and if not then to his brother, the appellant, John Arbulich, Jr., a Yugoslav citizen and resident. The father predeceased Charles. Both Thomas and John (John through the Consul General of Yugoslavia) filed petitions to determine heirship, it being contended by Thomas that John was ineligible to take under the will for the reason that Yugoslavia, so it is claimed, does not grant reciprocal rights of inheritance to American citizens inheriting from citizens of Yugoslavia within the meaning of section 259 of the Probate Code. John claimed such reciprocal rights existed. A petition by one claiming to be the widow of Charles was also filed, but the issues presented by that proceeding have been settled and are not here involved.

"After a trial which spread over many months because of numerous continuances granted to permit the parties to secure and to present evidence on the basic issue of reciprocity, the trial court determined that reciprocity did not exist, that John was therefore ineligible to take under the will, and that the entire estate should be distributed to Thomas as the sole remaining heir at law. John, through the consul general, appeals.

"Before discussing the evidence which, except for the testimony of the Yugoslav ambassador to the United States, is almost entirely documentary in character, some reference should be made to the general law governing such proceedings. It should be pointed out that section 259 of the Probate Code is not merely a procedural statute, but is part of the substantive law of succession. That being so, the statute as it read at the time of the death of the testator desiring to leave property to an alien governs. (*Estate of Giordano,* 85 Cal. App.2d 588 [193 P.2d 771].) Charles died March 21, 1947.

Section 259 as it read in March of 1947 (Stats. 1945, p. 2208, chap. 1160) and until its amendment in September of that year, then provided: 'The right of aliens not residing within the United States or its territories to take real property in

this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take real property upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are residents and the right of aliens not residing in the United States or its territories to take personal property in this State by succession or testamentary disposition, upon the same terms and conditions as residents and citizens of the United States is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take personal property upon the same terms and conditions as residents and citizens of the respective countries of which such aliens are residents. It shall be presumed that such reciprocal rights exist and this presumption shall be conclusive unless prior to the hearing on any petition for distribution of all or a portion of such property to an alien heir, devisee or legatee not residing within the United States or its territories a petition is filed by any person interested in the estate requesting the court to find that either one or both of such reciprocal rights does not or do not exist as to the country of which such alien heir, devisee or legatee is resident. Upon the hearing of such petition the burden of establishing the nonexistence of such reciprocal right or rights shall be upon the petitioner. Notice of such hearing shall be given in the manner provided by Section 1200 of this code.'

"Thus, as the section then read, there was a statutory rebuttable presumption that reciprocity existed, and the one contending there was a lack of reciprocity had the burden of proving that fact.

"The cases have also established the law to be that while the interpretation of foreign statutes and of treaties, when they alone are before the court, is a question of law, the question of how such statutes and treaties have been interpreted and applied by a foreign country is a question of fact. The appellate courts will not disturb a finding of reciprocity or of nonreciprocity that is supported by a presumption or is based on conflicting evidence. (*Estate of Schluttig*, 36 Cal. 2d 416 [224 P.2d 695]—finding of nonreciprocity with Germany on April 3, 1945, affirmed; *Estate of Miller*, 104 Cal. App.2d 1 [230 P.2d 667], finding of reciprocity with Germany as of April 22, 1942, affirmed; *Estate of Blak*, 65 Cal.

App.2d 232 [150 P.2d 567], a finding of reciprocity with the Netherlands (date of death not disclosed, but prior to 1942 and during German occupation of Holland) affirmed; *Estate of Giordano,* 85 Cal.App.2d 588 [193 P.2d 771], a finding of nonreciprocity with Italy as of January 17, 1945, affirmed; *Estate of Reihs,* 102 Cal.App.2d. 260 [227 P.2d 564], a finding of reciprocity with Germany as of November 24, 1946, affirmed; *Estate of Kennedy,* 106 Cal.App.2d 621 [235 P.2d 837], a finding of reciprocity with Romania as of March 15, 1949, affirmed.) In all of these cases it was held that where the finding of reciprocity or nonreciprocity was based on conflicting evidence or supported by a rebuttable presumption it would not be disturbed by an appellate court, even where, as to the same country, one trial court had found reciprocity to exist and another that it did not. (Compare the Schluttig, Miller and Reihs cases, cited *supra.*)

"The case of *Estate of Kennedy,* 106 Cal.App.2d 621 [235 P.2d 837], sets forth several other rules that are here applicable. It held that the facts that a limited nationalization or socialization of property and industry had taken place in Romania, or that that country was communistic in nature and dominated by Russia, did not compel a finding of nonreciprocity. It also held that once a statute enacted prior to the death of the testator involved is proved to exist, a presumption that such statute continued to exist arises under the provisions of section 1963, subdivision 32, of the Code of Civil Procedure, and that once such a statute is proved to exist, it will be presumed that the terms of such statute have been carried out under the provisions of section 1963, subdivisions 15 and 33, of the Code of Civil Procedure.

"The cases of *Estate of Miller,* 104 Cal.App.2d 1 [230 P.2d 667], and *Estate of Blak,* 65 Cal.App.2d 232 [150 P.2d 567], held that the fact that the property inherited in a foreign country could not be immediately transferred to the United States, due to the war or to foreign exchange regulations, was not relevant on the issue of reciprocity.

"Thus, in the instant case, appellant was entitled, in the trial court, to the rebuttable presumption that reciprocity existed. If he could prove the existence of a treaty or statute of Yugoslavia enacted prior to March 21, 1947, granting reciprocity, he was then entitled to the rebuttable presumptions that that law continued to exist, and that such law was and would be enforced according to its terms. Since the trial court has found against these presumptions and against

reciprocity, the question is whether, keeping in mind the burden of proof and these presumptions, there is any substantial evidence or reasonable inferences therefrom to support the finding.

"Although the burden was on respondent to prove non-reciprocity, the appellant agreed to present his evidence that reciprocity existed before respondent offered his evidence.

"The appellant first introduced a treaty of 1881 between Serbia and the United States, and the certificate of then Secretary of State George C. Marshall dated May 21, 1948, duly authenticated, certifying that such treaty is still in force and effect between Yugoslavia and the United States. That certificate traces the history of the Kingdom of Serbia into the Kingdom of the Serbs, Croats and Slovenes, into the Kingdom of Yugoslavia, and finally, in November of 1945, into the Federal People's Republic of Yugoslavia, and certifies that by agreement between the two countries the Serbian treaty of 1881 was still in full force and effect. The final clause of the certificate states 'that the said treaty remains in full force and effect between the United States of America and Yugoslavia.'

"Article II of that treaty reads as follows:

" 'In all that concerns the right of acquiring, possessing, or disposing of every kind of property, real or personal, citizens of the United States in Serbia and Serbian subjects in the United States, shall enjoy the rights which the respective laws grant or shall grant in each of these states to the subjects of the most favoured nation.

" 'Within these limits, and under the same conditions as the subjects of the most favoured nation, they shall be at liberty to acquire and dispose of such property, whether by purchase, sale, donation, exchange, marriage contract, testament, inheritance, or in any other manner whatever, without being subject to any taxes, imposts, or charges whatever other or higher than those which are or shall be levied on natives or on the subjects of the most favoured state.

" 'They shall likewise be at liberty to export freely the proceeds of the sale of their property, and their goods in general, without being subjected to pay any other or higher duties than those payable under similar circumstances by natives, or by the subjects of the most favoured state.'

"There was next introduced the certificate of Sava N. Kosanovic, Ambassador to the United States for Yugoslavia, duly authenticated by our State Department, and dated May 15,

1948, concerning the law of Yugoslavia with respect to the estates of decedents. The certificate contains the categorical assertion that reciprocity exists within the meaning of section 259 of the Probate Code. The certificate states that the ambassador knows of his own knowledge that the Constitution and laws of Yugoslavia 'accord to citizens of the United States of America, including citizens of the State of California, though not residing in . . . Yugoslavia, the reciprocal rights of inheritance prescribed and referred to in Sections 259 . . . of the Probate Code of the State of California. The Constitution and laws of the Federal Peoples Republic of Yugoslavia permit and grant to citizens of the United States of America, including citizens of the State of California, though not resident in . . . Yugoslavia rights equal to those accorded to Yugoslav citizens residing in . . . Yugoslavia to take by will or succession any and all property located within . . . Yugoslavia,' subject to the Nationalization Law of December 5, 1946, as amended April 28, 1948. The certificate then states that this Nationalization Law as amended provides for 'the nationalization of real property owned by foreigners, except immovable property of farmers tilling their own land, buildings serving in the main as the homes of the owners thereof,' but, under the provisions of that act 'all the owners of nationalized property, are entitled to full compensation for such property.'

"The certificate then goes on to state that by agreement with the United States 'all treaties previously concluded with the former Kingdom of Serbia . . . are in full force and effect' between the United States and Yugoslavia. The certificate then quotes article II of the United States and Serbia treaty of 1881, above quoted, and then certifies that the government of Yugoslavia 'has at all times construed and does now construe and respect said treaty as providing for and guaranteeing complete reciprocal rights of inheritance between the United States of America and . . . Yugoslavia so that citizens of the United States of America, including citizens of the State of California, residing in the United States or wherever they may reside have the full and unabridged right to inherit and to receive and have paid to them all inheritances, by last will and testament or by succession, all money and property, real and personal, bequeathed, devised or due to them by the laws of the succession situated in the Federative Peoples Republic of Yugoslavia from the estates of deceased citizens' of Yugoslavia, subject only to the Nationalization Law as amended.

"A supplemental certificate of the ambassador, duly authenticated and dated October 14, 1948, was also introduced. The ambassador there certifies that the rights of foreigners to inherit property in Yugoslavia as set forth in the original certificate has been the law since 1918 and up to the present time, and that there has been no change in such laws and none is contemplated. It is certified that 'it has always been the fixed policy of my Government and its predecessors to fully protect, preserve and assure the rights of all foreigners and residents outside of Yugoslavia to enjoy, take and receive full rights of inheritance of property, real, personal or mixed, without discrimination, in the same manner and to the same extent as residents and nationals of Yugoslavia' subject only to the Nationalization Laws. It is further certified, when moneys are due and payable to Yugoslav residents from United States decedents as a result of inheritance, that the recipients in Yugoslavia receive such moneys in Yugoslavia at the official rate of exchange free of any imposts, levies or taxes, 'and they have free and unabridged use and enjoyment thereof' subject only to such limitations as are imposed on Yugoslav nationals for the protection of the state. This supplemental certificate also notes that on July 19, 1948, the United States and Yugoslavia negotiated a claims agreement by the terms of which the Yugoslav government engages to authorize Yugoslav nationals indebted to anyone in the United States 'to meet such indebtedness on maturity.' By the terms of that agreement Yugoslavia agreed to pay $17,000,000 to the United States for American property nationalized in Yugoslavia, to be distributed by the United States among the rightful claimants.

"In addition to these two certificates, Ambassador Kosanovic was called as a witness by appellant. He testified that he was not only the Yugoslav ambassador to the United States, but also a minister in the cabinet and a member of the Praesidium, the highest authority in his country. He presented a copy of the Constitution of Yugoslavia adopted in 1946 which, according to his testimony and supported by an examination of the document, makes no discrimination, so far as the right to enjoy and inherit property is concerned, between Yugoslav citizens and foreigners. The Constitution provides that the 'inheritance of private property is guaranteed. The right of inheritance is regulated by law.' In addition, the ambassador testified that there was no discrimination as against foreigners in connection with the right of inheritance, and that if inher-

itance taxes are paid in the United States on a bequest to a Yugoslav citizen, that person will receive the inheritance without further tax. He several times reiterated his statement that there were no laws or rules or regulations in any way restricting the right of an American to receive and to enjoy his inheritance in Yugoslavia. On cross-examination he testified that his country had exchange controls, and that under Yugoslav law anyone in the country receiving foreign exchange could be compelled to sell it to the state bank at regular exchange rates. He testified that there were no big estates in Yugoslavia, that the land formerly owned by big landowners had been nationalized, and that the maximum ownership of one individual is twenty-five hectares,* but that former owners including foreigners, were compensated. He also testified that money received by inheritance by Yugoslav citizens could be fully owned and enjoyed by such citizens.

"Appellant then, over the objection that it was incompetent, irrelevant and immaterial, introduced as an official document an official communication between the Yugoslav Ministry of Justice and the Yugoslav Ministry of Labor dealing with the reciprocity question. This document states that under Yugoslav law 'the courts extend protection to all individuals in the exercise of their [inheritance] rights, regardless of whether they be Yugoslav nationals or foreign nationals.' It also states that under the 1881 treaty, which Yugoslavia recognizes, American citizens inheriting from Yugoslav nationals enjoy exactly the same rights and privileges over such property as do Yugoslav nationals. It is also asserted that the Ministry of Justice has always informed Yugoslav courts that reciprocity of inheritance exists between Yugoslavia and the United States. Attached is a copy of a decree of a Belgrade court distributing a portion of an estate in Yugoslavia to a United States citizen.

"Another official communication between the Yugoslav Ministry of Finance and the Ministry of Labor, over objection, was introduced in which it is stated that the Ministry of Finance has never issued any regulation limiting the right of inheritance of estates of Yugoslav citizens by American citizens. The document states that, due to the shortage of foreign exchange, it has not always been possible to transfer funds from Yugoslavia to the United States, but that it is the intention of the government to allow such transfers as soon as conditions permit.

*A hectare is 2.471 acres.

"This was appellant's case. It is obvious that such evidence, independent of the presumption of reciprocity, would fully support a finding of such reciprocity. But the trial court found that reciprocity did not exist. The question is whether there is any substantial evidence to support that finding.

"Respondent first offered two letters, one from C. W. Cannon, United States Ambassador to Yugoslavia, dated August 14, 1947, and addressed to the then Attorney General of California, and the other from A. G. Heltberg, American consul at Belgrade, dated November 4, 1948, and addressed to Frank O'Brien, respondent's attorney. Neither of the letters to which these two letters were responses was offered. Both letters introduced purport to discuss certain laws and regulations of Yugoslavia and purport to give opinions as to how they are enforced. Appellant objected to the introduction of these letters on the grounds that they were incompetent, irrelevant, and immaterial, were hearsay and that no proper foundation had been laid for their introduction. The objections were good. The letters should not have been admitted. There was no showing that Cannon or Heltberg were experts on Yugoslav law. In fact, the Heltberg letter states that 'this office can not assume responsibility for statements made in respect to the laws of Yugoslavia.' The letters were merely informal documents, and certainly were not official documents. The important question of whether a sovereign state abides by its laws and treaties should not be made to depend upon informal offhand opinions of officials who may or may not be experts. Without a further showing, the letters should not have been admitted.

"It must not be assumed that these two letters support the finding of nonreciprocity. They do not. Both relate primarily to the foreign exchange controls limiting the transfer of funds from Yugoslavia to this country, a factor which, under the cases already cited, is not relevant on the issue of reciprocity. Cannon's letter was apparently in response to a letter from the attorney general telling Cannon that several Yugoslav residents and citizens had applied to recover funds on deposit in California banks, and inquiring if American citizens with money on deposit in Yugoslavia could withdraw such money, and requesting information about any currency regulations that might exist. Cannon replied that there were stringent regulations in force 'with regard to the export of foreign exchange and the transfer of property abroad.' Ref-

erence is made to pertinent provisions of the Foreign Exchange Law putting all foreign exchange transactions under government control, and requiring a permit for such transactions. The following paragraph of the letter is particularly relied upon by respondent:

" 'According to the Embassy's information, the Yugoslav authorities have, so far, not only granted no foreign exchange permits to American claimants to the proceeds of property in Yugoslavia, but have, with minor exceptions, made it impossible for American citizens to establish their claims. In only one known instance has an American citizen actually been able to bring his claim to the point where his attorney could apply for a foreign exchange permit, and that application has been refused. This case involved a legacy.'

"The letter then refers to the confiscation and nationalization of many American properties. This letter was written before the claims settlement agreement, already referred to, was entered into between the two countries.

"The letter of Heltberg to O'Brien also deals primarily with the foreign exchange law, a copy of which was enclosed. The letter states that the 'law provides for a tight control of all foreign currencies held by Yugoslavia, and it is the opinion of the Embassy that American heirs ordinarily would not be able to transfer their inherited monies [sic] into American currency.' Attention is then called to the fact that the embassy has records of but one case of such a transfer since the end of the war, and to a communication from the Yugoslav government informing the embassy that 'it would grant transfers of funds derived from legally inherited properties within the limits of available foreign exchange stocks. However, because of lack of foreign exchange, the amounts for the time being would have to be deposited with the National Bank of the Federative People's Republic of Yugoslavia in Yugoslav currency as property of foreign successors.'

"The letter goes on to mention the fact that the Yugoslav decree of March 20, 1948 'permits acquisition of real estate in Yugoslavia by foreigners but only on the basis of legal inheritance or for official use. All other real estate owned by foreigners would be nationalized. The American heir, however, would have little control over his inherited properties. He would have to have the approval and consent of the competent state authorities before he could sell, transfer or dispose of the property. He would not be able to sell, transfer or dispose of the property to a non-Yugoslav citizen. The amount of in-

come derived from the property and the use of the property would be determined by local housing authorities. Furthermore, to complicate matters, the Yugoslav Government does not recognize the right of their citizens to be nationalized as American citizens. The Embassy believes it possible that a person possessing Yugoslav nationality under Yugoslav law and American citizenship under American law could inherit Yugoslav real estate in the same manner as other purely Yugoslav citizens. When such a dual national is subsequently divested of his Yugoslav nationality, his previously inherited properties in Yugoslavia would presumably be seized without right of indemnity.'

"There was next introduced into evidence by respondent, without objection from appellant, a letter with six enclosures to Lawyer O'Brien dated December 24, 1948, from Francis E. Flaherty, Acting Assistant Chief, Division of Protective Services, Department of State, Washington, D. C. The letter calls attention to the decree of March 20, 1948, passed a year after the death of the decedent here involved, which contains the following sentence: 'Foreign citizens may not acquire right of property on real estate on the territory of the Federative People's Republic of Yugoslavia, except on the basis of legal inheritance.' The letter then states that it had been thought that the Nationalization Law, which provides: 'On the day this law becomes effective, all real estate owned by foreigners . . . will be nationalized,' nullified the right of aliens to inherit at all, but by a decree of June 23, 1948, the right of foreigners to gain ownership of real property 'on the basis of legal inheritance' was reaffirmed. The letter then sets forth the same restrictions on such ownership as were set forth in Heltberg's letter above quoted, and then states that the Nationalization Law and the June decree 'are presently interpreted by Yugoslav officials so as to permit alien heirs to inherit or succeed to property only when, under Yugoslav law, they are also natural heirs of the deceased.'

"The enclosures are translations of various laws and decrees and of a note from the Yugoslav Ministry of Foreign Affairs to the United States dated October 9, 1948. Several of the enclosed laws and decrees relate to the foreign exchange controls that have already been mentioned. One of the enclosures is a decree dated March 20, 1948, relating to the 'Control of Real Estate Transactions.' This decree was not in effect when decedent died. It provides that all transfers of real property

are 'subject to prior approval by the competent state authorities,' and provides that such authorities shall deny such approval when the transfer is made for speculative purposes, or when such transfer will produce a larger income than needed for livelihood, or would exceed the maximum area allowed for agricultural ownership. This decree also prohibits a foreign citizen from owning land 'except on the basis of legal inheritance.' Attached to this decree is an 'Obligatory Interpretation' by the Praesidium, the highest authority in Yugoslavia, to the effect that a Yugoslav who acquires another citizenship forfeits his real estate to the state without compensation.

"The official note above referred to from the Ministry of Foreign Affairs of Yugoslavia to this country stated that the 'Yugoslav Courts strictly apply all Yugoslav provisions, laws and international agreements clearly regulating the rights of foreign citizens to acquire or inherit to [sic] real or personal property situated in Yugoslavia, within the limits of the existing provisions and without any discrimination, i.e., under the same conditions as citizens of the most favoured nation.' Reference is then made to the decree of March 20, 1948, limiting foreign real estate holdings to those acquired as 'heirs at law,' and then it is argued that such provision is consistent with treaty obligations because all foreigners are treated alike. It is then stated that as to transfers abroad of legally inherited properties the Yugoslav government 'will grant such transfers within the limits of available foreign exchange stocks,' and when such stocks are not available the sum in question can be temporarily deposited in the national bank, in Yugoslav currency, as property of foreign successors.

"Without objection, appellant next introduced a Yugoslav decree dated July 16, 1946, relating to the acquisition of real property by foreigners. It provides that foreigners may acquire real property in Yugoslavia 'either by legal business among the living or by legacy (in case of death) only by previous approval of the competent government agency.' A lease to a foreigner for over five years likewise requires a permit, but neither of these limitations applies 'to acquisitions of real estate by legal inheritance.' Agencies are designated with permit issuing powers and the right of appeal granted from their decisions.

"Also without objection a copy of the Nationalization Law was introduced. In court counsel for respondent read into the record an amendment to that act adopted April 28, 1948, more than a year after the death of the decedent here involved. By

the amendment, most real estate, as of the effective date of the amendment, owned by foreigners, was nationalized, except real estate operated by peasant farmers or used by the owner as living quarters. The amendment also provided that Yugoslav citizens who became foreign citizens lose the right of ownership of real estate.

"Also without objection there was introduced another letter from Heltberg, American Consul in Yugoslavia, addressed to the California State Controller and dated January 19, 1949. Most of the material in this letter is cumulative of material already introduced. It refers to the decree of March 20, 1948, limiting the right of foreigners to acquire real estate except 'on the basis of legal inheritance,' and then points out that such clause has been informally interpreted by the Yugoslav officials 'to mean that foreign citizens may inherit property if they, under Yugoslav law, are considered to be the natural heirs of the deceased. If property is willed to some other person than the natural heir that person may not succeed to the property in question.' It is also pointed out that Americans succeeding to property in Yugoslavia would be faced with various restrictions and controls. The letter then discusses the penalties of dual citizenship, and then continues: 'Since 1945, the Embassy has no record of any case where American citizens have been heirs in Yugoslav estates. It is generally believed that the political affiliations of the American heir would not affect his right to inherit unless he was a dual national and his property liable to confiscation for crimes against Yugoslavia.'

"The only other exhibits introduced by respondent were two booklets of speeches by Yugoslav leaders which add nothing to the other evidence already mentioned.

"On this evidence the trial court found that reciprocity as to both real and personal property did not exist. The estate here involved consisted, at the time of death, of both real and personal property, the real property having been sold during the course of administration. There can be no doubt at all that the weight of the evidence indicates that reciprocity exists. Certainly that is true as to the personal property. However, we cannot say, as a matter of law, that reciprocity exists as to the real property. It is probably true that there are evidence or inferences therefrom that support the finding of nonreciprocity as to real property. The evidence of the laws, decrees and interpretations to the effect that foreigners can succeed to Yugoslav real estate only if they are heirs at law,

that a Yugoslav who acquires American citizenship forfeits his rights in real property in Yugoslavia, etc., probably support the finding of nonreciprocity as to the real property. But even as to this issue the evidence is not satisfactory because most of these laws, decrees and interpretations were passed or made after the death of the decedent here involved. It is the law in effect at the time of such death in which we are here interested. It is by no means clear that such laws, decrees and interpretations are construed to be retroactive. That may be cleared up on a new trial.

"Even though it be assumed that there is some evidence, or inferences therefrom, that support the finding of nonreciprocity as to the real estate, there are other factors disclosed by the record that require a reversal and the granting of a new trial. The record discloses that the trial court considered and gave great weight to evidence not relevant to the issue of reciprocity, and that the finding of nonreciprocity was partially based on this nonrelevant evidence. That this is so is conclusively demonstrated by an examination of the transcript, of the memorandum opinion of the trial court, and of the findings.

"On numerous occasions during the trial the court expressed great distrust of the form of government existing in Yugoslavia, and expressed great interest in what would happen to the bequest here involved when delivered in Yugoslavia. Great interest was shown in the foreign exchange regulations that would constitute a restraint on an American citizen transferring Yugoslav funds inherited there to this country. For example, the trial court stated at R.T. page 221: 'We know that Yugoslavia today is dominated by a Communistic government. They are in power today. Now, this Court, the stand that I have taken is that I would have to have pretty good evidence before I would distribute to anyone, or to any government back there that is dominated by the Communists. [What became of the presumption that reciprocity exists?] Having this case in mind, I met people who have been there, lived there, even when I was on a little vacation in Arizona, and I met a woman who lived there, and they took all of her property. They confiscated all of the business of her husband and herself.' At pages 135, 150, 160, 223 and 243 appear other comments by the trial judge indicating how strongly he was motivated by the fact that the government of Yugoslavia was socialistic or communistic.

"The theory upon which the trial court proceeded is also disclosed in the memorandum opinion. It is there stated:

'Furthermore, it has not been established to the satisfaction of the Court that the said John Arbulich, Jr. [the Yugoslav heir] would receive the benefit of any distribution to him of the balance of the estate, consisting of cash in excess of $30,000.00. It was established at the hearings by the testimony of the Yugoslav Ambassador Kosanovic that the present government of Yugoslavia is Communistic and that the property rights of individuals are completely ignored. Under the circumstances the Court cannot in good conscience order $30,000.00 or more distributed to the claimant in Yugoslavia or to any representative of that country without any assurance whatever that the distributee would ever receive any part of such funds.'

"Thus the trial judge not only indicated that he would not consider the presumptions already mentioned in favor of reciprocity, but also indicated that he had forgotten or would not consider the documentary and oral testimony to the effect that the Yugoslav heir would be permitted in Yugoslavia to enjoy the full benefits of the bequest.

"The weight given by the trial court to these factors is also disclosed in the formal findings. Finding X reads as follows: 'That at the time of death of said decedent the Government of Yugoslavia was Communistic and has been ever since, and that the property rights of individuals are ignored, and that, under the circumstances, the Court could not, in good conscience, order distribution to the claimant in Yugoslavia. That under the laws and regulations of Yugoslavia, John Arbulich, Jr., does not have any rights of ownership or control of his property, and if distribution were ordered to John Arbulich, Jr., it would, in fact, be distribution to the Communistic Government of Yugoslavia. Such distribution would be against public policy and contrary to provisions of Section 27 of the California Probate Code.'

"There is no evidence at all that the Yugoslav claimant would not be permitted to enjoy his legacy in Yugoslavia. The evidence is all the other way. The solemn declaration of the Ambassador from Yugoslavia that the Yugoslav claimant would receive the money free of any tax and that he would enjoy 'free and unabridged use and enjoyment thereof' could not thus lightly be disregarded. The ambassador is the highest diplomatic official of the country he represents, and his declarations about the law and practices in his country are entitled to great weight.

"The fact that the court disapproved of the form of the

government of Yugoslavia was not relevant at all on the issue of reciprocity. Yugoslavia is a sovereign state and is recognized as such by the government of the United States. As long as some right of inheritance is recognized in that state, and the evidence here without conflict discloses that it is, the fact that such right differs from the right of inheritance in this country, or that as an individual a judge may disapprove of the form of government, are factors which are not relevant and should not be considered on the issue of reciprocity. This was clearly pointed out in the *Estate of Kennedy,* 106 Cal. App.2d 621 [235 P.2d 837], involving Romania, a country that is not only communistic, but within the sphere of influence of Russia, which Yugoslavia certainly is not. Some degree of socialization and nationalization has taken place in most European countries, a policy we as individuals may or may not approve, but as judges passing on the issue of reciprocity, the form of such governments is a false factor, and a matter for each sovereign country to determine for itself.

"The fact that an American claimant of an estate in Yugoslavia would be subject to foreign exchange controls and could not immediately receive his legacy in this country is also an irrelevant factor. Practically every country in the world has some limitation on the export of wealth from the country. Such factor has nothing to do with the issue of reciprocity. It was so held in *Estate of Miller,* 104 Cal.App.2d 1 [230 P.2d 667], and *Estate of Blak,* 65 Cal.App.2d 232 [150 P.2d 567].

"Much is said in the briefs about the proper interpretation of the treaty of 1881 and about how such treaty should be interpreted in view of the case of *Clark* v. *Allen,* 331 U.S. 503 [67 S.Ct. 1431, 91 L.Ed. 1633, 170 A.L.R. 953]. The question is not how that treaty should be interpreted as a matter of law, but how the contracting parties have interpreted it. The ambassador testified that it had been interpreted to grant reciprocity to all American nationals. While there is no evidence directly contrary to this, there may be inferences that would support a finding to the contrary. Any gaps in the evidence on this point can be supplied on the new trial.

"Enough has been said to indicate that the finding of lack of reciprocity was based partially upon inadmissible evidence, upon factors irrelevant to the issues, and upon laws and regulations and decrees passed after the death of decedent. This being so, the judgment cannot stand. A new trial should

be had at which only admissible evidence and relevant factors are considered.

"There is one other point that must be considered. Respondent contends, and the trial court found, that appellant was not properly represented in the proceeding. For that reason, it is urged, this judgment must be affirmed. It should be pointed out that, in spite of this finding, the trial court also disposed of the case on its merits. Such disposition is, of course, inconsistent with a finding that the appellant had made no proper appearance in the action.

"The contention that appellant was not properly represented is based upon the fact that the lawyer appearing on behalf of appellant was appointed by the consul general of Yugoslavia to represent appellant. The lawyer had no power of attorney from appellant nor any other direct authority to represent him. Throughout the trial. counsel for respondent objected on this ground, and the trial judge, on many occasions, observed that he thought a personal power of attorney was indispensable. As already pointed out, an express finding was made on this issue.

"The petition of John Arbulich, Jr., alleges that it is filed by the consul general of Yugoslavia as attorney in fact for John. It is further averred that under the power and authority vested in the consul general by the United States and by the laws and treaties between the United States and Yugoslavia, he, as consul general, has the power and authority to act as attorney in fact for his nationals who inherit American property. The recognition by the United States of the consul general with power 'to exercise and enjoy such functions, powers and privileges as are allowed to the Consuls General of the most favoured Nations in the United States' was duly proved. The question is, can the consul general appear in our courts as attorney in fact for his nationals in a probate proceeding? Can a consul appoint counsel to represent such nationals? The answer is clear that he may.

"The parties discuss the proper interpretation of an article in the Consular Convention between the United States and Serbia concluded in 1881, contemporaneous with the other Serbian treaty already mentioned in this opinion, and, like it. recognized by both the United States and Yugoslavia as being still binding. Article XI provides:

" 'In the case of the death of any citizen of the United States in Serbia, or of a Serbian subject in the United States without having any known heirs or testamentary executors by

him appointed, the competent local authorities shall give information of the circumstances to the Consuls or Consular Agents of the nation to which the deceased belongs, in order that the necessary information may be immediately forwarded to the parties interested.

" 'Consuls General, Consuls, Vice Consuls and Consular Agents shall have the right to appear personally, or by delegate, in all proceedings on behalf of the absent or minor heirs or creditors until they are duly represented.'

"The parties argue over the proper interpretation of this treaty. Appellant argues that the second paragraph should be read independently of the first so as to give the consul general the power alleged to exist. Respondent argues that the first paragraph limits the operation of the second paragraph to nationals dying abroad in the other country, and does not include the right to represent in the other country nationals residing at home. If the document alone be considered, either interpretation is reasonable. But the treaty provision must be considered together with applicable principles of international law. Without reference to any treaty provision, it is a well settled principle of international law that consular representatives are deemed to be international attorneys in fact for their nations. One of the earliest cases so holding, and a leading case on the subject, is *The Bello Corrunes*, 6 Wheat. (U.S.) 152 [5 L.Ed. 229]. In that case the United States Supreme Court held that a vice consul of Spain was entitled to make a claim by way of libel on behalf of Spanish owners of a Spanish ship resident in Spain and whose identities were unknown to the consul. In that case the following frequently quoted statement appears (p. 168) : 'On the first point made by the attorney-general, this court feels no difficulty in deciding, that a vice-consul, duly recognized by our government, is a competent party to assert or defend the rights of property of the individuals of his nation, in any court having jurisdiction of causes affected by the application of international law. To watch over the rights and interests of their subjects, wherever the pursuits of commerce may draw them, or the vicissitudes of human affairs may force them, is the great object for which consuls are deputed by their sovereigns; and in a country where laws govern, and justice is sought for in courts only, it would be a mockery, to preclude them from the only avenue through which their course lies to the end of their mission. The long and universal usage of the courts of the United States, has sanctioned the exercise of this right, and it is im-

possible, that any evil or inconvenience can flow from it. Whether the powers of the vice-consul shall, in any instance, extend to the right to receive, in his national character, the proceeds of property libelled and transferred into the registry of a court, is a question resting on other principles. In the absence of specific powers given him by competent authority, such a right would certainly not be recognized. Much, in this respect, must ever depend upon the laws of the country from which, and to which, he is deputed. And this view of the subject will be found to reconcile the difficulties supposed to have been presented by the authorities quoted on this point.'

"In the case of *In re Tartaglio's Estate,* 12 Misc. 245 [33 N.Y.Supp. 1121], it was held, both as a result of an interpretation of a treaty with Italy and by general international law, that the Italian consul general could properly apply and receipt for the distributive shares of personal property on behalf of the Italian heirs.

"In the case of *Buxhoeveden* v. *Estonian State Bank,* 41 N.Y.Supp.2d 752, there is a good collection of case and text authorities. There, both by treaty and on general principles, the Estonian consul general was permitted to appear and set aside a default judgment, and to defend a suit against the Estonian State Bank, treated in the opinion as a private person.

"The case of *In re Zalewski's Estate,* 292 N.Y. 332 [55 N.E.2d 184, 157 A.L.R. 87], is another good case on the subject, and collects and comments on many relevant authorities. There it was held by the New York Court of Appeals that either by treaty or by general principles of international law, a consular representative could even exercise on behalf of one of its nationals resident in the home country the personal right of a widow to elect not to take under a will. While three justices dissented in that case, they did so only on the ground that the power of the consul did not extend to the exercise of such a personal right—they did not disagree with the majority holding that a consul has the right to appear and to represent his nationals.

"In interpreting the treaty provision here involved, the following principles stated in *In re Zalewski's Estate,* 292 N.Y. 332 [55 N.E.2d 184, 186, 157 A.L.R. 87], amply supported by authority, are applicable: 'In arriving at the meaning of the treaty we are bound to remember that it is the supreme law of the land . . ., that its words are to be taken liberally in the light of evident purposes . . . and that, since the pact is done

in counterparts, one in each language little use can be made of local technical definitions of words. . . . When two constructions of a treaty are admissible, one restrictive of the rights that may be claimed under it and the other liberal, the latter is always to be preferred. . . . ''This court would not readily lean to favor a restricted construction of language, as applied to the provisions of a treaty, which always combines the characteristics of a contract, as well as a law.'' *The Bello Corrunes,* 6 Wheat. (U.S.) 152, 171 [5 L.Ed. 229].'

''With these well settled principles in mind we have no reasonable doubt but that the treaty here involved should be interpreted so as to confer a treaty right on the consuls of the contracting countries to appear on behalf of their nationals not otherwise represented and to represent them in the courts of the other country.

''This conclusion would be almost inevitable were it not for the case of *Estate of Clausen,* 202 Cal. 267 [259 P. 1094]. There it was held that the Danish consul did not have the right to receive distribution of and receipt for the interests of Danish nationals under the then treaty with Denmark. The treaty there involved was one entered into in 1826 and related solely to problems of navigation and commerce existing between the two countries. It contained a clause that for the protection of navigation and commerce each country would agree to receive and admit consuls from the other who should enjoy all the privileges and powers of consuls conferred by either on the consuls of the most favored nation. Nearly a hundred years after this treaty was entered into, United States entered into a much broader treaty with Germany which expressly conferred upon consuls of either country the power on behalf of nonresident nationals to receive and to receipt for distributive shares of estates to which such nonresident nationals were entitled. The Supreme Court of California ruled, purely as a matter of interpretation of the treaty, and without reference to general principles of international law, that the treaty between Denmark and the United States related solely to problems of navigation and commerce, and that the powers conferred by that treaty on consuls related solely and exclusively to such problems. Thus the treaty with Germany did not operate under the most favored nation clause to confer any rights on Danish consuls except in connection with navigation and commerce. The court did not discuss the right of the Danish consul to appear and represent his national residing in Denmark in the probate proceeding under the general prin-

ciples of international law above discussed. It simply decided that such consul, under the treaty, had no power to have distributed to himself and to receipt for the share of the estate to which the Danish national was entitled. (See, also, *Petersen* v. *Lyders*, 139 Cal.App. 303 [33 P.2d 1030], and *Lyders* v. *Petersen*, 88 F.2d 9.)

"The present case differs from the Clausen case in several particulars. The present case does not involve the right of the Yugoslav consul general to have distributed to him and to receipt for the property bequeathed to appellant. The proceeding on appeal is not for distribution, but to determine heirship. Several times during the trial counsel appointed by the consul general stated that he was not contending that the estate should be distributed and receipted for by the consul general. He agreed that the court could order the estate distributed directly to appellant, and, in that event, offered to see that the estate was distributed to appellant and receipted for by him. This is important, not only because it serves to distinguish the instant case from the Clausen case, but because it also meets the doubts expressed in the case of the *Bello Corrunes*, 6 Wheat. (U.S.) 152 [5 L.Ed. 229]. In the quotation from that case above set forth the United States Supreme Court expressed doubt that, under general principles of international law, a consular representative could have the proceeds of the pending action distributed to himself, but had no doubts about the power of such representative to appear and to represent his absent national.

"In the second place, the Clausen case limited its decision to an interpretation of the treaty involved. It did not discuss the power of a consul, independent of treaty, to appear and to represent his nonresident nationals in lawsuits in the country to which such consul was accredited.

"In the third place, the instant case is distinguishable from the Clausen case because unlike the treaty involved in the Clausen case, the treaty here, properly interpreted, confers the very power involved. Moreover, under general principles of international law, consuls possess the power to appear for and to represent their nonresident nationals in the courts of the country to which such consul is accredited."

I would, therefore, reverse the judgment.

Appellant's petition for a rehearing was denied June 18, 1953. Carter, J., and Traynor, J., were of the opinion that the petition should be granted.