Filed 11/15/23

**CERTIFIED FOR PARTIAL PUBLICATION**[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| In re the Marriage of V.S. and V.K. | H050105<br>(Santa Clara County<br>Super. Ct. No. 19FL002753) |
| V.S.,<br><br>       Appellant,<br><br>       v.<br><br>V.K.,<br><br>       Respondent. | |


An out-of-state marriage is "valid" in California if it "would be valid by laws of the jurisdiction in which the marriage was contracted." (Fam. Code, § 308.) In this appeal from the trial court's bifurcated determination of the parties' date of marriage, we consider whether the trial court erred by concluding that the 2010 Hindu marriage ceremony (the Phera) the parties celebrated in India was not legally binding under the Hindu Marriage Act of 1955 (Hindu Marriage Act or the Act) and that the parties were therefore not married until their later civil ceremony in the United States. Wife V.S. argues that the trial court erroneously (1) failed to treat husband V.K.'s earlier admission that the parties were married as of the 2010 Phera as a judicial admission of fact rather

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II(C).

than a legal conclusion, (2) misinterpreted the Act as requiring Indian domicile, and (3) failed to conclude that the parties' celebration of the Phera at a minimum left V.S. with a good faith belief that the parties were legally married.

We conclude that the date of the parties' marriage here is a predominantly legal conclusion not susceptible of judicial admission as though it were a disputed fact. In our independent judgment—admittedly circumscribed by the narrow sample of Indian authorities and expert testimony on which the parties rely—we conclude that the trial court did not err by concluding that the Phera was not legally binding on V.K., who was not domiciled in India and did not voluntarily submit to be bound by the Act. In the unpublished portion of the opinion, we further conclude that substantial evidence supports the trial court's determination that V.S. was not entitled to treatment as a putative spouse as of the date of the Phera. We affirm the trial court's order.

## I. BACKGROUND

### A. *The Marriage*

V.S. and V.K., both born in India, met in 2009 in Illinois, where they both lived. On December 15, 2010, during a trip to India, they participated in the Phera. A few years later, on July 5, 2013, the couple participated in a civil marriage ceremony in Chicago, Illinois.

### B. *The Dissolution Petition*

In July 2019, V.S. petitioned for dissolution of the marriage, specifying that the parties' date of marriage was December 15, 2010. Although V.K. in his response likewise indicated the date of marriage as December 15, 2010, he later argued that the date of marriage was the date of the Chicago civil ceremony. The trial court bifurcated the issue of the date of marriage and set the matter for a separate trial.

2

**C.** *The Bifurcated Trial*

    **1.** *The Hindu Marriage Act*[1]

A principal issue in the bifurcated trial was the application of the Hindu Marriage Act, which "extends to the whole of India" (subject in the relevant time period to exceptions inapplicable here) "and applies . . . to Hindus domiciled in the territories to which this Act extends who are outside the said territories" (Hindu Marriage Act, § 1(2)) and applies to "any person who is a Hindu by religion in any of its forms or developments" (*id.*, § 2(1)).  Registration of a marriage is not compulsory, and failing to register a marriage does not affect its validity even if an Indian state has made registration compulsory.  (*Id.*, §§ 8(2) & 8(5).)

---

[1] We grant V.S.'s request for judicial notice of the following documents:  (1) the current version of the Hindu Marriage Act, a former version of which was admitted into evidence by the trial court as Respondent's Exhibit 12 or Petitioner's Exhibit C; (2) *Central Bank of India v. Ram Narain* (Supreme Court of India 1955) 1 SCR 697, which the trial court took judicial notice of as Respondent's Exhibit 16; (3) *Vinaya Nair & Anr. V. Corporation of Kochi* (High Court of Kerala 2006) 2006 SCC OnLine Ker 74 (*Vainaya Nair*); (4) *Kashmira Kale v. Kishorekumar Mohar Kale* (High Court of Bombay 2010) W.P. No. 1242 of 2010 (*Kale*); (5) *Sondur Gopal v. Sondur Rajini* (Supreme Court of India 2013) Civil Appeal No. 4629 of 2005 (*Gopal*), with Civil Appeal No. 487 of 2007, which the trial court took judicial notice of as Respondent's Exhibit 15; (6) *Kim Dawn Thomas v. State of Haryana* (High Court of Punjab & Haryana 2014) CWP No. 2498 of 2014 (*Thomas*); and (7) *Karan Goel v. Kanika Goel* (High Court of Delhi 2020) MAT.App.(F.C.) 101/2020 & CM.APPL.21530/2020 (*Goel*), which the trial court expressly took judicial notice of in its statement of decision.  (See Evid. Code, § 452, subd. (f) [the "law of an organization of nations and of foreign nations and public entities in foreign nations" is subject to permissive judicial notice].)

We likewise grant V.K.'s corresponding request that we take judicial notice of a different version of *Gopal*, to the extent the version provided by V.S. lacks headnotes, which V.K.'s expert contends are approved by the judges of the Supreme Court of India who delivered the judgment.

It is undisputed that the parties' solemnization of the Phera satisfied the ceremonial requirements under the Act.[2]  It is also undisputed that the parties' marriage in India was never formally registered.  The parties, however, disputed whether V.K. and V.S. were domiciled in India at the time of the Phera and whether the Act applies only to Indian domiciliaries.  To interpret the Act, both parties presented testimony from attorneys licensed in India who had experience litigating unspecified issues under the Act.  The parties also cited several cases from various Indian courts, including the Supreme Court of India, interpreting the Act in various contexts.

### 2.    *V.K.'s Expert (Prashant Kenjale)*

Prashant Kenjale, an "Advocate on Record" before the Supreme Court of India[3] testified that each state in India has its own high court, the decisions of which may be appealed to the Supreme Court of India.

Kenjale opined that the Hindu Marriage Act "only applies to Hindus who are domiciled in India" and would not apply where only one of the parties to the marriage resided in India.  Marriages governed by the Hindu Marriage Act do not need to be registered to be valid, even though individual states may otherwise require registration.

---

[2] Under the Act, "[a] Hindu marriage may be solemnized in accordance with the customary rites and ceremonies of either party thereto.  [¶]  (2)  Where such rites and ceremonies include the *Saptapadi* (. . . the taking of seven steps by the bridegroom and bride jointly before the sacred fire), the marriage becomes complete and binding when the seventh step is taken."  (Hindu Marriage Act., § 7(2).)

[3] Kenjale explained the professional classification as follows: "[A]n advocate who has passed law in India can appear before any of the courts in India except [the] Supreme Court of India.  [The] Supreme Court of India recognizes only Advocate[s] on Record.  This is a privilege and examination set by [the] Supreme Court of India after practice of five years. After practice of five years, any advocate in India can [take] this examination."  Kenjale testified that of 2 million advocates in India, 2,000 are Advocates of Record.

But unless both parties to the marriage were domiciled in India, they would need to register the marriage under the Special Marriage Act.

Kenjale testified that the Supreme Court of India had construed the Hindu Marriage Act in *Gopal*, *supra*, 7 SCC 426, ruling that a person of Hindu faith who is domiciled in another country is not subject to the Act absent an "action to concede himself to [its] jurisdiction." Kenjale opined that volunteering to be subject to the Act requires "not only an active step, [but] an official step" beyond participating in a ceremony like the Phera itself, such as registering the marriage. According to Kenjale, because V.K. was a permanent resident of the United States since 2003, he "cannot be termed a domicile of India" and therefore the Hindu Marriage Act was inapplicable to him.

### 3.    *V.S.'s Expert (Shubham Gupta)*

Gupta, an "Advocate on the Court" presently studying to become an "Advocate of Record," initially opined that domicile has no role in determining the applicability of the Hindu Marriage Act, relying on *Vinaya Nair & ANR v. Corporation of Kochi*, *supra*, 2006 SCC Online Ker 74, 275 and *Thomas*, *supra*, CWP No. 2498 of 2014. Gupta went on to state, however, that if one party to a marriage is domiciled in India and the other party is not, the party who is not domiciled in India must "volunteer by his actions that he is subjecting himself to the applicability of [the] Hindu Marriage Act" to submit to the Act. Asked by V.S.'s counsel to explain this testimony, Gupta then opined that "it [is] . . . a reasonable presumption" that a Hindu not domiciled in India who participates in a Phera has voluntarily submitted to the Hindu Marriage Act and that this presumption may be rebutted by "negative indicia"—for example, a "nondomicile person has to do an overt act that he is not subjecting himself to the applicability" of the Act.[4]

---

[4] On recross-examination, Gupta agreed with counsel that his "idea of volunteering under the Hindu Marriage Act" was "[n]ot directly" based on any case from the Supreme Court of India. It was his "personal interpretation" that a person of Hindu

5

According to Gupta, *Gopal* addressed domicile as it related to the "jurisdiction of Indian courts."

### 4.    *V.K.'s Testimony*

V.K. was born in India to a Hindu family.  He moved to the United States in 2001, applying for permanent residency after his move.

In 2010, V.K. and V.S. participated in a traditional Phera wedding ceremony in India.  V.K. did not take part in sending out the Phera invitations, and he did not help with any of the wedding planning.  Although there was an e-mail from his account inviting his friend Gary Lambert to the wedding, V.K. could not recall sending the message.  None of V.K.'s Indian friends attended the Phera.

V.K. did not intend to legally marry V.S. until she (1) signed a prenuptial agreement and (2) stopped medicating him (V.S. was a psychiatrist).  V.K. communicated these conditions to V.S., and he believed that she understood them.  He agreed to participate in the Phera, however, because he understood that for V.S., as an Indian woman raised in the Hindu faith, it would otherwise be considered "taboo" for her to be intimate with him.  V.K. also testified that, under medication, he lacked the will to tell V.S., " 'Hey, I won't even do the [Phera] if you don't agree to prenuptial; if you don't agree to stop my medications[.]' "  A friend who was an attorney in India assured V.K. that, not being domiciled in India, V.K. could simply forgo registration of the marriage and then "figure it out" with V.S. in the United States.  V.K. accordingly participated in the Phera believing it would not establish a legally valid marriage.  He recognized, however, that V.S.'s mother considered the parties to be married after the Phera.

After the Phera, V.K. bypassed two opportunities to register the parties as married.  First, he refused his father's offer of a registration form to register their marriage.  Next,

---

faith who is not domiciled in India and who solemnizes a marriage in India must show, by an overt act, that he or she is not submitting to the Act's application.

the month after the Phera, V.K. and V.S. visited the Indian consulate in Chicago to renew V.S.'s passport, where they were again provided a form to register their Indian marriage; V.K. declined to complete the form. V.S. also renewed her United States exchange visitor visa (a J-1 visa) rather than apply for a spousal visa, even though they expected V.K.'s permanent resident status would make a spousal visa easier to acquire. V.S. agreed to apply for renewal of the exchange visitor visa because V.K. was not willing to support a spousal visa application.

V.K. referred to V.S. as his wife only twice before their July 2013 civil marriage in Chicago; once in the presence of a former professor who had attended the Phera, and once in protest when V.S. was assaulting him. His tax returns through 2012 all indicated his status as "single."

According to V.K., during their family-based immigration interview, both V.K. and V.S. told the interviewer that their date of marriage was July 5, 2013. V.K. believed that the sole reason for their Chicago wedding was that their Indian marriage was not valid. Both V.K.'s and V.S.'s parents traveled to attend the ceremony in Chicago.

V.K. acknowledged that in his response to V.S.'s dissolution petition, he indicated that the parties' date of marriage was December 2010. At the time he signed the response, he had just been released from psychiatric hospitalization following a mental health crisis and was a "broken-down man." V.S. had also recently served V.K. with divorce papers and had told him that she wanted sole legal custody of their daughter.

V.K. spoke with his then-attorney about amending his response to correct the date of marriage, but they ultimately did not proceed with an amendment because they had hoped that the case would settle. A week before the bifurcated trial, V.K. attempted to have his response amended, but the court clerk told him that he either needed the court's permission or opposing counsel's consent.

7

**5.** *V.S.'s Testimony*

V.S., a psychiatrist, had been practicing medicine in the United States for 12 years. She was born in India to a Hindu family and had initially come to the United States to complete a medical residency program.

V.S. met V.K. in 2009 in Chicago. Within the first month of meeting, they discussed marriage, and V.K. introduced V.S. to his mother. V.S.'s mother visited Chicago in December 2009 because V.S. had told her that she and V.K. would marry. V.S. later told her mother to go ahead and start the wedding planning process and to coordinate with V.K.'s family. V.K. wanted to invite his American friends. V.S. invited her best friends from college and medical school.

After the Phera, V.K. insisted that V.S. spend the night with him, citing his status as her husband, even though the bride traditionally spends the night with her parents. V.K. also gave V.S. a mangalsutra, a necklace that married women traditionally wear. V.S. believed that she and V.K. were married, but she did not take steps to register their marriage in either India or the United States. The couple also had a wedding reception in V.K.'s hometown of Kolkata several days after the Phera.

V.S. knew that V.K. was a permanent resident of the United States, and she planned on honoring her Phera vow to stay by her husband's side. She also intended to finish her education in the United States.

After the Phera, V.S. applied for an exchange visitor renewal J-1 visa and indicated that she was traveling with no family members. She also reentered the United States on her J-1 visa and not with a spousal visa. V.S. renewed her Indian passport four months after the Phera, and on her application, she left blank the space for the name of her spouse.

V.S. disputed V.K.'s claim that he declined an opportunity to register the Hindu marriage at the consulate: she testified that she called the Consulate General of India in

Chicago and was informed that the consulate did *not* have the power to register an Indian marriage.

V.S. testified that it was V.K. who took care of the couple's tax returns, and the first time she filed taxes herself was in 2021 for her 2020 taxes. V.S. acknowledged that her tax returns filed in 2010, 2011, and 2012 all stated that she was "single" but insisted that she did not sign any of those returns: she believed that V.K. must have put her signature on the returns. V.K.'s sister-in-law prepared V.S.'s 2011 tax return. V.S. acknowledged that she received an e-mail from the sister-in-law in 2011 with her tax return but did not review the return carefully before replying that the return was "approved."

The purpose of the 2013 civil ceremony was to secure proof of their marriage to support V.S.'s green card application. V.S. believed that if they did not have the civil ceremony, they would have to travel back to India to register their marriage.

Between the 2010 Hindu ceremony and the 2013 civil ceremony, V.S. terminated three pregnancies. She terminated the pregnancies because V.K. was abusive, and she was not sure if she could continue to tolerate the abuse.

After the 2013 civil ceremony, V.S. applied for a spousal waiver for her J-1 visa renewal. The form indicated the date of marriage was July 5, 2013.

**D.      *Post-Trial Request to Amend Response (Form FL-120)***

After the bifurcated trial on the date of marriage but before the trial court issued its statement of decision, V.K. filed a request to amend his response V.S.'s dissolution petition, seeking to modify the date of marriage on his response to July 5, 2013. A hearing on the request to amend the response was set for January 4, 2022, but there is nothing in the record to indicate that a hearing took place.

**E.      *The Trial Court's Statement of Decision and Order***

In its final statement of decision on the bifurcated issue of the date of marriage, the trial court found that the parties' date of marriage was July 5, 2013. The trial court

9

concluded that V.K. had met his burden of proving that the Phera did not result in a valid marriage under the Hindu Marriage Act[5] because at least V.K. was not domiciled in India at the time of the ceremony. The trial court found the issue of V.S.'s domicile to be "puzzling" but concluded that, even if she had been domiciled in India at the time of the Phera, the Phera did not create a valid marriage because (1) V.K. did not concede by his actions that he was nonetheless willing to be subject to the Act, as is required according to Kenjale, and (2) V.K. demonstrated by his overt acts that he was not subjecting himself to the applicability of the Act, as is required according to Gupta.

The trial court also addressed the issue of whether V.K. had judicially admitted the date of marriage to be in 2010. Noting that V.K. had not sought to amend his response to the dissolution petition until more than two years after he filed the original response, the trial court ultimately found there was "good cause for permitting such relief [to amend the pleadings] which serves in the interest of justice." The trial court thus found that V.K. was not bound by the date of marriage set forth in his response to V.S.'s dissolution petition.

And finally, the trial court concluded that V.S. was not a putative spouse after the Phera, finding that she did not "believe honestly, genuinely, and sincerely" that she was married after December 15, 2010.

We granted V.S.'s motion to immediately appeal the bifurcated issue of the date of marriage. Several weeks later, V.K. filed his amended response to V.S.'s dissolution

---

[5]V.S. had argued in the trial court that a ceremonial marriage is presumed valid (Evid. Code, § 663), and the party attacking the validity of the marriage thus has the burden of proof (see *Estate of DePasse* (2002) 97 Cal.App.4th 92, 107, overruled on a different point in *Ceja v. Rudolph & Sletten, Inc.* (2013) 56 Cal.4th 1113, 1126 (*Ceja*)). The trial court therefore proceeded on the assumption that it was V.K.'s burden to establish that the date of marriage was not 2010 but 2013.

petition in the trial court, this time alleging the parties' date of marriage was July 5, 2013.[6]

## II.    DISCUSSION

### A.    *V.K.'s Judicial Admission*

On appeal, V.S. first argues that the trial court erred by failing to resolve the date of marriage in accordance with V.K.'s earlier admission that the parties married in 2010. V.S. argues that V.K.'s belated attempt at amending his response was ineffectual in negating the prior admission because an amended response was not filed until after the trial court rendered its decision on the date of marriage. We conclude that the trial court properly found that V.K. was not bound by his prior response.

#### 1.    *Legal Principles*

In a marital dissolution proceeding, the response to a dissolution petition is considered a pleading. (Cal. Rules of Court, rule 5.74.) "The admission of fact in a pleading is a 'judicial admission.' Witkin describes the effect of such an admission: 'An admission in the pleadings is not treated procedurally as evidence; i.e., the pleading need not (and should not) be offered in evidence, but may be commented on in argument and relied on as part of the case. And it is fundamentally different from evidence: It is a *waiver of proof* of a fact by conceding its truth, and it has the effect of removing the matter from the issues. Under the doctrine of "conclusiveness of pleadings," a pleader is bound by well pleaded material allegations or by a failure to deny well pleaded material allegations. [Citation.]' [Citation.]" (*Valerio v. Andrew Youngquist Construction* (2002) 103 Cal.App.4th 1264, 1271; see also 4 Witkin, Cal. Procedure (6th ed. 2023), § 464.)

"Thus, if a factual allegation is treated as a judicial admission, then neither party may attempt to contradict it—the admitted fact is effectively conceded *by both sides*."

---

[6] We grant V.K.'s request for judicial notice of the amended response that was filed in the trial court. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

11

(*Barsegian v. Kessler & Kessler* (2013) 215 Cal.App.4th 446, 452.) However, "[le]gal conclusions and assertions involving a mixed question of law and fact are not the stuff of judicial admissions." (*Stroud v. Tunzi* (2008) 160 Cal.App.4th 377, 384 (*Stroud*); *Castillo v. Barrera* (2007) 146 Cal.App.4th 1317, 1324; see also *Bahan v. Kurland* (1979) 98 Cal.App.3d 808, 812 ["[w]hen the underlying facts pleaded and averred in declarations in opposition to a motion for summary judgment belie the pleaded conclusion, and indicate the existence of an important fact question, the mistaken conclusion on the part of a pleader should not preclude a trial of the issues on its merits"].)

### 2. *Analysis*

Applying these general principles, we conclude that the date of marriage was a legal conclusion and not a factual allegation that can be treated as a judicial admission. The parties' date of marriage under Family Code section 308 turns on an interpretation of the Hindu Marriage Act, the relevant law of the jurisdiction in which the marriage was contracted. Whether the 2010 Phera in India resulted in a valid marriage that can be recognized in California is thus a legal conclusion (or at the least, a mixed question of law and fact) that is not subject to a judicial admission. (Evid. Code, § 310, subd. (b) [determination of law of a foreign nation is a question of law]; see also *Stroud*, *supra*, 160 Cal.App.4th at p. 384.)

*In re Marriage of Elali & Marchoud* (2022) 79 Cal.App.5th 668 (*Elali & Marchoud*) is illustrative. On appeal, the Fourth District rejected the wife's claim that the trial judge's eventual finding that the parties' marriage was void contradicted both parties' judicial admissions that they were married: "[T]he issue is whether [the judge] erred as a matter of law in ruling that the Lebanese marriage was void . . . . This is a legal issue not a factual issue alleged in the pleadings. Therefore, regardless of the parties' allegations that they were married, [the third judge] properly ruled the Lebanese marriage void . . . ." (*Id.* at p. 681.)

12

As in *Elali & Marchoud*, the issue before the trial court in this case was whether the 2010 Phera ceremony in India established a marriage that was valid under Indian law, as distinct from Hindu custom. Thus, despite V.K.'s response that the parties' date of marriage was in 2010, the validity of the 2010 marriage was not contemplated by his admission. Accordingly, notwithstanding the fact that V.K. did not amend his response to V.S.'s petition until after the trial court issued its statement of decision, the trial court properly found that it was not bound by V.K.'s response that the parties married in 2010.[7]

**B.** *Validity of the 2010 Hindu Marriage*

Next, V.S. argues that the trial court erred by interpreting the Hindu Marriage Act to condition the validity of a Hindu marriage performed in India upon at least one participant's domicile in India and on the other's voluntary agreement to be subject to the Act. V.S. argues that the trial court below conflated three distinct legal concepts in coming to its decision: the extraterritorial reach of the Act, the jurisdiction of Indian courts to adjudicate marital disputes, and, in a California dissolution proceeding, the effect pursuant to the Act of a Hindu marriage ritual performed in India. And on appeal, V.S. now suggests that her own expert was incorrect and that domicile is categorically *irrelevant* to the validity of a Hindu marriage if the ceremony is performed in India.[8] V.S.'s legal arguments appear plausible on their face—viewed through the prism of California and United States law— distinguishing as they do between personal jurisdiction and the validity of a marriage at the time and location in which the marriage

---

[7] V.S. argues that the trial court erred because its legal rationale for declining to bind V.K. to his prior admission was flawed as it mistakenly relied on Indian law and erroneously questioned the applicability of the judicial admission doctrine. However, even assuming that some of the trial court's stated reasons were erroneous, "if a judgment is correct on any theory, the appellate court will affirm it regardless of the trial court's reasoning." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

[8] V.S. complains that the testimony provided by both experts was "quite frankly, internally inconsistent and contradictory."

13

is performed.  But we remain mindful that we are examining an issue of Indian law, and we do not presume that the legislative body of a sovereign nation necessarily intended to observe these same legal distinctions in drafting the Act.  Our independent review of the applicable statute, the Indian caselaw provided by the parties, and the expert testimony at trial discloses no error in the trial court's interpretation of the Act.

> **1.**      ***Legal Principles and Standard of Review***

As previously stated, "[a] marriage contracted outside this state that would be valid by laws of the jurisdiction in which the marriage was contracted is valid in California." (Fam. Code, § 308.)  Whether the parties' participation in the Phera resulted in a marriage valid under Indian law is, on this record, primarily a legal conclusion in which the proper interpretation of Indian law predominates.

"The decision of what the law of a foreign state is has . . . by legislative authority, been squarely and unequivocally made the independent responsibility of the judge.  The same rule authorizes an independent determination by an appellate tribunal, even though the trial court has received and studied extensive material of the subject and ruled on the matter during trial." (*Gallegos v. Union-Tribune Pub. Co.* (1961) 195 Cal.App.2d 791, 798; see also Evid. Code, §§ 310, subd. (b), 452, subd. (f); *Societe Civile Succession Richard Guino v. Redstar Corp.* (2007) 153 Cal.App.4th 697, 702, superseded by statute on other grounds as stated in *Hyundai Securities Co., Ltd. v. Lee* (2013) 215 Cal.App.4th 682, 693 (*Hyundai*).)  On appeal, we are "empowered to consider the applicable statutes, court decisions, and constitutional provisions of foreign nations to determine their legal import without being limited by the findings of the trial court." (*In re Gogabashvele's Estate* (1961) 195 Cal.App.2d 503, 508, disapproved of on a different point as stated in *In re Larkin's Estate* (1966) 65 Cal.2d 60, 84.)[9]  Under Evidence Code section 454,

---

[9] Before 1957, courts treated the disputed meaning and effect of foreign law as a question of fact, the determination of which was subject to review for substantial evidence.  (See, e.g., *Estate of Arbulich* (1953) 41 Cal.2d 86, 99 (*Arbulich*); *Logan v.*

subdivision (b), when the subject of judicial notice is the law of a foreign nation, the court may consult "the advice of persons learned in the subject matter," where provided in open court or in writing.

Although the determination of a foreign law is question of law that we review independently, "[w]e defer to the trial court's determination of facts if supported by substantial evidence." (*In re Marriage of Brewster & Clevenger* (2020) 45 Cal.App.5th 481, 500 (*Brewster*).)

### 2.  *The Relevance of Domicile Under the Hindu Marriage Act*

The plain text of the Act twice references "domicile[]" in defining the Act's scope. Section 1(2) of the Act, which describes its territorial reach, states:  "[The Act] extends to the whole of India . . . and applies also to Hindus *domiciled* in the territories to which this Act extends who are outside the said territories."  (Hindu Marriage Act, § 1(2), italics added.)  Considered in isolation, "extend[ing] to the whole of India" in section 1(2) could encompass anyone physically present within the country, even if only for the duration of a Phera.  But in keeping with the title of the Act, section 2 makes clear that the Act has selective and not general application.  Section 2(1), which identifies those who are subject to the Act, specifies that the Act applies:  "(*a*) to any person who is a Hindu by

*Forster* (1952) 114 Cal.App.2d 587, 595-596.)  In 1957, however, the Legislature amended former Code of Civil Procedure section 1875, which first set forth the framework that permits trial courts to judicially notice the law of foreign countries.  (See *In re Gogabashvele's Estate*, *supra*, 195 Cal.App.2d at p. 508.)  Although some recent cases have suggested that disputed questions of law can become a question of fact, these cases largely rely on pre-1957 cases.  (See *W.M. v. V.A.* (2018) 30 Cal.App.5th 64, 76, fn. 7 ["disputed meaning of a foreign law is a question of fact for determination by the trial court," relying on *Estate of Shluttig* (1950) 36 Cal.2d 416, 424]; *Hyundai*, *supra*, 215 Cal.App.4th 682, 692 [if a foreign law cannot be determined, a factual determination may be required, relying on *Arbulich*, *supra*, 41 Cal.2d at p. 90.].)

religion[10] in any of its forms or developments, . . . , [¶] (*b*) to any person who is a Buddhist, Jaina, or Sikh by religion, and [¶] (*c*) to any person *domiciled* in the territories to which this Act extends who is not a Muslim, Christian, Parsi or Jew by religion, unless it is proved that any such person would not have been governed by the Hindu law or by any custom or usage as part of that law in respect of any of the matters dealt with herein if this Act had not been passed." (Hindu Marriage Act, § 2(1), fn. and italics added.) Section 2(1) on its face operates as a limitation on the application of the Act even within "the whole of India" to which it extends under section 1(2).

The proper construction of this limitation has produced a divergence of opinion within the Indian judiciary and among certain Indian officials charged with registration of marriages. But the Supreme Court of India in *Gopal*, *supra*, 7 SCC 426 has held that one must be domiciled in India to be subject to the Act, absent voluntary submission.

In reaching this conclusion, the Supreme Court noted that a plain reading of Section 1(2), which "provides for the extent of the Act" made it "evident that [the Act] has extra-territorial operation." (*Gopal*, *supra*, 7 SCC at p. 434, ¶ 18.) It cautioned, however, that laws having extra-territorial operation must have some "nexus" with India: "In our opinion, unless such contingency exists, the Parliament shall be incompetent to make a law having extra-territorial operation." (*Id.* at p. 434, ¶ 19.) Thus, the language in *Gopal* suggests that the high court in India was concerned that *if* the Act were to have insufficient nexus with India, the law would be "vulnerable" to being deemed invalid. (*Id.* at p. 435, ¶ 21.)

Bearing in mind the law's potential invalidity should it lack sufficient nexus with India, the *Gopal* court interpreted section 1(2) as providing that the Act "extends to *the*

---

10 The Act further explains that "Hindu . . . by religion" includes "any child, legitimate or illegitimate, both of whose parents are Hindus, Buddhists, Jains or Sikhs by religion." (Hindu Marriage Act, § 2(1).)

*Hindus of* [the] whole of India" as well as those "Hindus domiciled in India who are outside the said territory." (*Id.* at p. 434, ¶¶ 20-21, italics added.) The Supreme Court of India next concluded that "this extra-territorial operation of law is saved not because of nexus with Hindus but [with] Hindus *domiciled in India*." (*Id.* at p. 435, ¶ 21, italics added.) Although Indian domicile is likewise not specified in Section 2(1)(a) of the Act as a requirement for persons of Hindu faith, the Supreme Court inferred such a requirement from the joint operation of sections 1 and 2: "Section 2 will apply to Hindus when the Act extends to that area in terms of Section 1 of the Act." (*Id.* at p. 436, ¶ 27.)

The Supreme Court in *Gopal* carved out an exception to the domicile requirement in circumstances where "one of the parties is Hindu of Indian domicile and the other party a Hindu volunteering to be governed by the Act." (*Id.* at p. 436, ¶ 24.) Thus, under *Gopal*, the Act applies to those Hindus who are domiciled in India. And, if only one party to the marriage is domiciled in India, the other party must "volunteer[] to be governed by the Act." (*Ibid.*)

In reaching this conclusion, the Supreme Court of India overruled the decisions of the high courts of a number of Indian states, including the Kerala High Court's decision in *Nair*, *supra*, 2006 SCC Online Ker 74, that had construed the Act to govern people of Hindu faith irrespective of their domicile: "[T]aking a view that the provisions of the Act would apply to a Hindu whether domiciled in the territory of India or not does not lay down the law correctly" because such a construction would offend what the Supreme Court of India considered a fundamental limitation on the authority of India's Parliament. (*Gopal*, *supra*, 7 SCC at pp. 435-436, ¶ 24.)

The *Gopal* court also stated an independent textual rationale for its requirement of Indian domicile. Any other interpretation, according to *Gopal*, would render "redundant" the word "domiciled" in Section 1(2)'s specification that the Act extends to "Hindus domiciled in the territories to which this Act extends who are outside the said territories": like our own interpretive rule against surplusage, the *Gopal* court observed that it is "an

17

accepted principle of interpretation" that "[t]he legislature ordinarily does not waste its words." (*Gopal*, *supra*, 7 SCC at p. 435, ¶ 24; cf. *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1042.)

V.S., however, maintains that there is no requirement of Indian domicile for the Act to apply, relying in part on *Nair*, *supra,* 2006 SCC Online Ker 74, 275 and *Thomas*, *supra*, CWP No. 2498 of 2014.  In both cases, the petitioning couple successfully sought issuance of a writ of mandate directing the relevant state official to register their solemnized marriage, despite the extraterritorial domicile of one party to the Hindu ceremony.  (*Nair*, *supra*, 2006 SCC Online Ker 74, 275; *Thomas*, *supra*, CWP No. 2498 of 2014.)  We do not read these cases as controlling authority for either the irrelevance of non-Indian domicile under the Act or the nonexistence of a requirement that a person of Hindu faith domiciled outside of India voluntarily submit to application of the Act.  In both *Nair* and *Thomas*, both parties to the solemnized marriage affirmatively sought to have their Hindu marriage legally recognized by the state via registration (not otherwise required under the Act), then sought the extraordinary remedy of mandamus when their attempts at registration were rebuffed.[11]  Such an action would appear to constitute "volunteering" oneself to be subject to the Act, as the Supreme Court of India allowed as an exception to the domicile requirement.  (*Gopal*, *supra*, 7 SCC at p. 436, ¶ 24.)  And neither case presented the issue here, where V.K. refused to register the Hindu ceremony as a marriage and the parties disputed the legal effect of the solemnization.  Accordingly, neither result is inconsistent with the Supreme Court of India's interpretation in *Gopal* that Indian domicile is critical to the application of the Act and that the conduct of the party domiciled abroad may establish voluntary submission to the Act.

---

[11] In light of *Gopal*, Kenjale specifically construed *Nair* is an example of a person domiciled outside of India "validating" an otherwise invalid marriage by registration and therefore "volunteering" to be governed by the Act.

We acknowledge that in *Nair*, however, the High Court of Kerala in granting the writ petition reasoned that the omission of "domicile" from section 2(1)(a) of the Act makes immaterial the country of domicile for a person who is Hindu by religion. (*Nair*, *supra*, 2006 SCC Online Ker 74, 278-279, ¶ 6.) But the Supreme Court of India in *Gopal* squarely rejected the Kerala High Court's statutory interpretation. Acknowledging that *Nair* found that "the Act would apply to Hindus resident in India whether they reside outside the territories or not," the Supreme Court of India unambiguously held that "the judgment of the Kerala High Court [in *Nair*] is erroneous." (*Gopal*, *supra*, 7 SCC at p. 436, ¶ 26; see also *id.* at pp. 433-434, ¶ 17.)[12]

Nor may we read *Thomas* as rehabilitating *Nair*'s now-discredited statutory interpretation, as opposed to merely endorsing its outcome. In *Thomas*, the High Court of Punjab and Haryana cited *Nair* only for its holding that "when the parties are Hindu by religion and their marriage is performed in accordance with [the] Hindu Marriage Act, then Registration of their marriage cannot be refused on the ground that one of the parties is foreign country domicile"; the *Thomas* court did not rely upon the *Nair* court's statutory interpretation and did not discuss the Supreme Court of India's analysis in *Gopal*. (*Thomas*, *supra*, CWP No. 2498 of 2014.) The *Thomas* decision, like the bare result in *Nair*, remains consonant with *Gopal*'s authoritative statutory interpretation.

---

[12]At oral argument, V.S. argued that *Gopal* rejected only paragraph six of the *Nair* decision, which interpreted Section 2 of the Act (see *Nair*, *supra*, 2006 SCC Online Ker at p. 278), leaving intact paragraph five's statement that Section 1 of the Act "applies to all persons even if they reside in different parts of the country." (*Nair*, *supra*, at pp. 278-279.) But the Supreme Court in *Gopal* interpreted sections 1 and 2 together, holding that "a view that the provisions of the Act would apply to a Hindu whether domiciled in the territory of India or not does not lay down the law correctly." (*Gopal*, *supra*, 7 SCC 426, 435-436, ¶ 24.) As both experts agreed, the Supreme Court is India's highest court, to which the high courts of India's several states are subordinate.

We agree with V.S. that the litigation at issue in *Gopal* is not analogous to the present case. *Gopal* did not purport to adjudicate the validity of the parties' marriage under the Act. Rather, the issue in *Gopal* was whether an Indian court had jurisdiction over the wife's petition for dissolution of the parties' marriage when the husband claimed to be domiciled in Australia. (*Gopal*, *supra*, 7 SCC 426, 431-432, ¶ 9.) Extraterritorial application of the Act is not at issue here: V.S. and V.K. are not seeking adjudication by an Indian court and neither party disputes that they solemnized their Hindu union in India and in accordance with Hindu custom. Unlike *Gopal*, the issue presented here, under Family Code section 308, is the application of the Act when the parties were both present (but at least one party was not domiciled) in India.[13]

Yet as a matter of statutory interpretation, we are unable to disregard the Supreme Court of India's pronouncement in *Gopal* as to the proper reading of sections 1(2) and 2(1) of the Act. And on appeal, V.S. has not directed us to any post-*Gopal* authority that clearly asserts that domicile is irrelevant if a Hindu ceremony is completed in India between two individuals of the Hindu faith.

V.S. relies on *Goel*, *supra*, MAT.App.(F.C.) 101/2020 & CM.APPL. 21530/2020, a post-*Gopal* decision in which the High Court of Delhi affirmed the family court's denial of a husband's motion to dismiss his wife's divorce petition. At the time of the Hindu marriage ceremony in New Delhi, the husband was a United States citizen domiciled in the United States and the wife was domiciled in India. The wife later

_____

[13] We likewise find factually distinguishable *Kale*, *supra*, W.P. No. 1242 of 2010, upon which V.K. relied in the trial court and on appeal. As in *Gopal*, the issue in *Kale* was whether the Indian court had jurisdiction to entertain a marital dissolution petition filed by a husband when the husband and the wife had "never resided together for any length of time" in India and had made the United States their "matrimonial home." Ultimately, *Kale* concluded that the Indian courts did not have jurisdiction over the parties' marital dissolution and that "the Act itself does not apply to the parties consequent upon their domicile in the [United States]."

20

petitioned a New Delhi court for dissolution of marriage. On the husband's appeal from the denial of his application to dismiss the dissolution petition, the High Court of Delhi first found that the Act "applies to all Hindus domiciled in the territories to which the Act extends." (*Id.* at p. 12, ¶ 22.) But, in reading Sections 1 and 2 of the Act together with Section 19, which discusses the courts to which a dissolution petition may be presented, the *Goel* court found that the Act "contemplates a situation where even if the wife is domiciled in India and the husband is not, remedies under the Act can be availed of by the wife." (*Goel*, *supra*, at p. 12, ¶ 22.) In particular, the *Goel* court focused its discussion on Section 19(iiia), a specific carve-out meant to "protect the rights of women deserted by NRI [(non-resident Indian)] husbands." (*Goel*, *supra*, at p. 13, ¶¶ 23.) Section 19(iiia) permits the filing of a dissolution petition "in case the wife is the petitioner, where she is residing [in India] on the date of presentation of the petition." The Delhi high court therefore concluded that the lower court did not erroneously reject the husband's pretrial application to dismiss where the disputed issue was whether the wife had abandoned her Indian domicile by following the husband to the United States and applying for United States citizenship: as the High Court of Delhi determined, this "is a mixed question of law and facts that can be established only in a trial, after evidence is led by the parties." (*Goel*, *supra*, at p. 23, ¶ 39.)

V.S. argues that under *Goel*, so long as she was domiciled in India, the Hindu Marriage Act applies. Yet V.S. reads *Goel* too broadly. Although the High Court of Delhi noted that the parties' marriage had been "solemnized under the Hindu law" (*Goel*, *supra*, MAT.App.(F.C.) 101/2020 & CM.APPL. 21530/2020 at p. 22, ¶ 36), it did not have occasion to address the legal validity of a Hindu marriage between persons of Hindu faith where only one is domiciled in India. There was no challenge raised in *Goel* as to the validity of the marriage in the first instance or whether the husband voluntarily submitted to the Act for the limited purpose of solemnizing the marriage. It is not apparent from the *Goel* decision whether the parties registered their marriage in India, or

21

whether the husband otherwise conceded that the marriage would be legally effective under the Act.

*Goel* was also concerned with a specific subset of dissolution petitions initiated under Section 19(iiia), which the High Court of Delhi interpreted as intended to protect abandoned wives by enabling them to maintain a dissolution petition in India so long as India is the wife's domicile. The Delhi high court intended its reconciliation of Section 19(iiia) and Sections 1 and 2 to guard against the possibility that "if a wife is abandoned in a foreign land on being deserted by the husband, she will be left with no remedy other than to institute/contest the case in a foreign land where she may have no financial means, wherewithal or support for the same." (*Goel*, *supra*, MAT.App.(F.C.) 101/2020 & CM.APPL. 21530/2020 at p. 22, ¶ 35.) The decision in *Goel* was thus quite limited: that "Section 19(iiia) read with Section 1 and Section 2 of the Act must be interpreted meaningfully and in such a manner as to confer jurisdiction on courts in India for entertaining a petition under the Act filed by the wife in circumstances where her husband has deserted her to go abroad or invoked the jurisdiction of foreign courts to obtain *ex-parte* orders/decree, leaving her with no efficacious remedy outside the country." (*Goel*, *supra*, at p. 23, ¶ 37.) Unlike the petitioning spouse in *Goel*, neither of the parties here seeks application of Section 19(iiia) of the Act. Nor does V.S. allege that the parties' dissolution implicates the policies underlying section 19(iiia): she makes no allegation that she has been abandoned in a foreign land upon where she lacks "financial means, wherewithal or support for the same" and therefore no recourse but to return to India to invoke the jurisdiction of its courts. Moreover, nothing in *Goel* allows us to presume that the husband there had disputed the validity of the parties' marriage under the Act, given that he, too, had filed his own petition for dissolution of that marriage in another jurisdiction. We therefore find no basis for finding the High Court of Delhi's specific application of section 19(iiia) to trump the Supreme Court of India's general interpretation of sections 1(2) and 2(1).

22

We also find unpersuasive V.S.'s attempts to analogize California law to Indian law. V.S. argues that domicile plays no role in determining whether a marriage solemnized in California (or another state) is valid in California. Yet comparing California law to the Hindu Marriage Act is of no assistance to V.S.'s position. For example, a valid marriage in California requires that the parties obtain a license (Fam. Code, § 300, subd. (a)), whereas there is no such requirement under the Act. We have no domestic precedent for determining the legal validity of a marriage based on features of the solemnization ritual or on the religious affiliation of the participants or their parents, rather than the participants' demonstration of their joint intent to be bound in marriage. We may not presume, under the guise of statutory interpretation, that this state's decision not to impose a particular requirement on marriages contracted in California authorizes us to relieve the parties of such a requirement apparently imposed by India's Parliament, according to India's highest court.

Our interpretation is also consistent with the conclusion reached by V.K.'s expert, Kenjale, who likewise interpreted *Gopal* as holding that the Act does not apply to a Hindu that is a domicile of another country unless he or she volunteers to be governed by the Act. Although *Gopal* was silent on what actions qualify as "volunteering" to be subject to the Act, Kenjale opined that volunteering requires an overt act separate from participating in the Hindu ceremony itself, such as registering the Hindu marriage. V.S.'s own expert, who initially testified that there was no domicile requirement, later qualified his opinion, stating that if one party to a marriage is not domiciled in India, that party must "volunteer" to have the Act apply. As V.S.'s counsel sought to rehabilitate this testimony, Gupta further posited that it was reasonable to interpret the Act as consistent with a presumption that a non-domiciled party who chose to be married in India has volunteered to be subject to the Act, which presumption may be rebutted by "negative indicia." Either way, both experts agreed that at least *one* party to the marriage must be a

23

domicile of India, while the other, non-domiciled party must in some way volunteer to be subject to the Act.

We are mindful that in discharging our responsibility to construe the Hindu Marriage Act, we are interpreting the law of a sovereign nation based upon the limited caselaw that the parties and their experts have supplied, without any other perspective on the Act beyond the "evidentiary" record, or any competence in Indian jurisprudence and Indian principles of statutory interpretation. Notwithstanding these limitations, it remains the case that, "to be successful on appeal, an appellant must be able to affirmatively demonstrate error on the record before the court." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822.)[14] Unless and until the Supreme Court of India or India's Parliament limits or clarifies the scope of the statutory interpretation advanced in *Gopal*, we treat that interpretation as controlling here.

### 3. *Application of the Hindu Marriage Act to This Case*

In this case, the trial court first determined that V.K. was not domiciled in India at the time of the Phera, a finding that V.S. does not challenge on appeal. The trial court further determined that even if it were to apply the less-stringent standard described by V.S.'s expert Gupta—that a party who is not a domicile of India must "volunteer" or there must be negative indicia to contradict the presumption that the Act applies—the evidence adduced at trial reflected that V.K.'s "overt actions consistently demonstrated that he did not volunteer to subject himself to the applicability of the [Hindu Marriage

---

[14] We note that under Evidence Code section 311, if the law of a foreign nation "is applicable and such law cannot be determined, the court may, as the ends of justice require, either: [¶] (a) Apply the law of this state if the court can do so consistently with the Constitution of the United States and the Constitution of this state; or [¶] (b) Dismiss the action without prejudice or, in the case of a reviewing court, remand the case to the trial court with directions to dismiss the action with prejudice."

24

Act]." We find that substantial evidence supports the trial court's factual findings. (See *Brewster*, *supra*, 45 Cal.App.5th at p. 500.)

V.K. testified that he twice declined to register the marriage—first when refusing his father's offer of a registration form and next when offered the registration form at the consulate. He further refused to support a spousal visa application for V.S., despite his understanding that the spousal visa would be a simpler approval than a renewal of her J-1 visa. Substantial evidence thus supports the trial court's finding that V.K. did not "volunteer" to be subject to the Act.

Arguing otherwise, V.S. asserts that the trial court erred because it relied on actions that V.K. took *after* the Phera ceremony, and V.K.'s post-Phera actions cannot negate a valid marriage. V.S. argues that the Hindu Marriage Act does not permit either party to the marriage to unilaterally dissolve a marriage "merely by going to another country and declaring otherwise." V.S., however, presumes the conclusion—the validity under the Act of the parties' Hindu marriage in the first instance—and accordingly misconstrues the trial court's application of Indian law. The trial court did not find that V.K. unilaterally dissolved a valid marriage under the Act. Rather, the trial court considered V.K.'s actions before and after the wedding ceremony as the requisite "negative indicia" to demonstrate that he did not intend to subject himself to the Act in the first place. Gupta, V.S.'s own expert below, stopped short of defining what he considered "negative indicia," but Kenjale, V.K.'s expert, testified that mere participation in the Phera was insufficient to demonstrate that a party domiciled abroad was conceding application of the Hindu Marriage Act.

Based on the foregoing, we conclude that V.S. has failed to demonstrate that the trial court erred by concluding that the 2010 wedding ceremony in India did not result in a valid marriage.

**C.** *Putative Spouse* [NOT CERTIFIED FOR PUBLICATION]

Finally, V.S. argues that the trial court erred when it determined that she was not a putative spouse. We disagree and conclude that substantial evidence supports the trial court's findings.

**1.** *Legal Principles and Standard of Review*

A putative spouse is one who "believed in good faith that the marriage was valid." (Fam. Code, § 2251, subd. (a).) "The good faith inquiry is a subjective one that focuses on the actual state of mind of the alleged putative spouse. While there is no requirement that the claimed belief be objectively reasonable, good faith is a relative quality and depends on all the relevant circumstances, including objective circumstances. In determining good faith, the trial court must consider the totality of the circumstances, including the efforts made to create a valid marriage, the alleged putative spouse's personal background and experience, and all the circumstances surrounding the marriage. Although the claimed belief need not pass a reasonable person test, the reasonableness or unreasonableness of one's belief in the face of objective circumstances pointing to a marriage's invalidity is a factor properly considered as part of the totality of the circumstances in determining whether he belief was genuinely and honestly held." (*Ceja*, *supra*, 56 Cal.4th at p. 1128.)

Here, whether V.S. was a putative spouse is "essential to the claim for relief" that she asserts below; thus, she bore the burden of proving that she was a putative spouse in the trial court. (See Evid. Code, §§ 500, 550.) "In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case.

26

[Citations.] [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for the reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 (*I.W.*), disapproved on a different point as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

### 2. *Analysis*

V.S. argues that to find her a putative spouse, the trial court was only required to find that she "believed in good faith that the marriage was valid" (Fam. Code, § 2251), and she testified during the hearing that she believed that she was married to V.K. as of December 15, 2010.

However, V.S.'s testimony was both contradicted and impeached, leaving room for a judicial determination that she did not have a good faith belief that the marriage in India was valid. (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) V.S. acknowledged that her tax returns filed in 2010, 2011, and 2012 all stated that she was "single," not married, although there was some dispute over whether she signed the returns. V.S. also acknowledged that after the Phera, she applied for an exchange visitor renewal J-1 visa indicating that she was traveling with zero family members. Additionally, V.S. entered the United States on her J-1 visa and not with a spousal visa. And later, V.S. renewed her Indian passport after the Phera ceremony, leaving the name of her spouse blank. Moreover, V.K. testified that V.S. knew his two express prerequisites for marrying—a prenuptial agreement and her cessation of his medications—prerequisites not met as of the Phera.

V.S. argues that the trial court's conclusion that she lacked a good faith belief in the validity of the marriage is unfounded because, assuming that domicile is required for

27

a valid Hindu marriage, the requirement of domicile would be a "legal subtlety" that could not plausibly have been known by V.S., who is not an attorney. Yet there is nothing in the record to support V.S.'s position that the trial court found V.S. lacking in good faith because it assumed she must have specialized legal knowledge. Rather, the trial court determined that the evidence belied V.S.'s claim that she had a good faith belief in the validity of the marriage—including V.K.'s testimony that he communicated to V.S. prior to the Hindu ceremony that he did not consider the marriage to be valid—as well as V.S.'s own actions afterwards, such as identifying herself as "single" in her tax returns and in other official documents.

Next, V.S. claims that the trial court inappropriately relied on the fact that she terminated three pregnancies between the date of the 2010 Phera ceremony and the 2013 civil ceremony in the United States. V.S. argues that the trial court's reference to the three pregnancy terminations interfered with her fundamental right to choose to bear a child or choose to have an abortion under Health and Safety Code section 123462, subdivision (c) because the court's decision created a presumption that choosing an abortion disentitles her from invoking the protections of a putative spouse under Family Code section 2551.

We do not construe the trial court's reference to V.S.'s reproductive decisions as infringing on her reproductive rights. The trial court did not penalize V.S. for lawfully exercising the choices then available to her, but merely considered her potential reasons for the exercise of her right to terminate those pregnancies which predated the parties' 2013 civil marriage in assessing her claimed good faith belief that she and V.K. were already married by virtue of the 2010 Phera. In part this was because V.S. herself testified that one of the seven vows she took during the Hindu ceremony included the concept of "dharma," which included her agreement to "bring children into the world with [her husband], and raise them together." To be clear, a subjective belief that the parties were not yet married is not the only reasonable inference to be drawn from V.S.'s

28

reproductive choices during this period. But we do not substitute our judgment for the trial court's resolution of disputed factual issues and its weighing of circumstantial evidence. (See *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 ["[i]f the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence"].)

V.S. also insists that the trial court erred by placing weight on evidence such as the tax returns and immigration documents, as well as finding persuasive the fact that the parties participated in a civil ceremony in the United States that V.S.'s mother attended. Yet these arguments essentially ask us to "review the record so as to recount evidence that supports [V.S.'s] position (reargument) with the object of reevaluating the conflicting, competing evidence and revisiting the . . . court's failure-of-proof conclusion." (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) That is not our role, and "[t]his is simply not a case where undisputed facts lead to only one conclusion." (*Id.* at p. 1529.)

And finally, V.S. insists that the trial court's conclusion that she was not a putative spouse was directly contradicted by its comment that she herself might be considered domiciled in the United States at the time of the Phera, given her vow at the Phera to "stay by her husband's side," which she argues suggests that she had a good faith belief that she was married to V.K. V.S., however, ignores the context of the trial court's statement—the trial court concluded that the issue of V.S.'s domicile, though "puzzling" in the court's estimation, was ultimately irrelevant; the court accordingly declined to make any finding and effectively presumed that she had been domiciled in India at the time of the Phera. We discern no irreconcilable conflict between the trial court's statements regarding V.S.'s domicile and its later finding that she did not meet her burden of proving she was a putative spouse.

29

Accordingly, we find no error in the trial court's conclusion that V.S. was not a putative spouse, as this is not a case where "the evidence compels a finding in favor of the appellant as a matter of law." (*I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)

### III.    DISPOSITION

The trial court's order finding that the parties' date of marriage is July 5, 2013 is affirmed.  V.K. is entitled to his costs on appeal.

_____

LIE, J.

WE CONCUR:

_____

GROVER, ACTING P.J.

_____

BROMBERG, J.

*V.S. v. V.K.*
H050105

Trial Court:                                Santa Clara County Superior Court
                                            Superior Court No.:  19FL002753


Trial Judge:                                The Honorable James E. Towery
                                            The Honorable Michael P. Smith


Attorneys for Appellant V.S.:               Complex Appellant Litigation Group

                                            Charles M. Kagay
                                            Claudia Ribet


Attorneys for Respondent V.K.:              Wayne J. Quint III

                                            Oak View Law Group

                                            Thomas A. Ingram


*V.S. v. V.K.*
H050105